No. 82,983

STATE OF KANSAS, *Appellee*, v. DANA LINN FLYNN, *Appellant*.

(55 P.3d 324)

Opinion filed September 27, 2002.

*Kurt P. Kerns*, of Ariagno, Kerns, Mank & White, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*Chris E. Biggs*, county attorney, argued the cause, and *Robin Graham*, assistant county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

*Per Curiam*: Dana Flynn appeals her jury convictions of first-degree premeditated murder, conspiracy to commit first-degree murder, and conspiracy to commit perjury. Flynn raises the following issues: (1) The trial court erred in refusing to sever the conspiracy to commit perjury charge from the murder charges, (2) the State presented insufficient evidence to sustain its burden of proof, (3) prosecutorial misconduct denied her right to a fair trial, (4) the trial court admitted irrelevant inflammatory evidence, (5) the trial court improperly admitted hearsay evidence in violation of her rights under the Confrontation Clause of the United States Constitution, (6) cumulative trial error denied her right to a fair trial, and (7) the district court erred in refusing to grant her a new trial based upon newly discovered evidence. We consider and reject each of Flynn's claims, and affirm the jury convictions.

This appeal follows the jury convictions in a joint trial of Dana Flynn and Mikel Dreiling for the December 22, 1992, death of Randy Sheridan. The jury convicted Mikel of first-degree murder, conspiracy to commit murder, terroristic threat, and conspiracy to commit perjury. We do not recite the facts in this case; for a detailed statement of facts see the companion case of *State v. Dreiling*, 274 Kan. 518, 520-39, 54 P.3d 475 (2002).

## Analysis

### 1. Failure to file a timely notice of appeal

Before reaching the merits of this appeal, we briefly pause to consider whether this case is properly before us because of an untimely filed notice of appeal.

"The right of appeal is entirely a statutory right; no appellate review is required by the United States Constitution [citation omitted] or the Kansas Constitution [citation omitted]. It is the established rule in this state that this court has no jurisdiction to entertain an appeal by a defendant in a criminal case unless the defendant appeals within the time prescribed by the statutes providing for such an appeal. [Citations omitted.] The Supreme Court has only such appellate jurisdiction as is conferred by statute pursuant to Article 3, Section 3, of the Kansas Constitution, and when the record discloses a lack of jurisdiction, it is the duty of the Supreme Court to dismiss the appeal. [Citations omitted.]" *State v. Ji*, 255 Kan. 101, 102-03, 872 P.2d 748 (1994).

Because this crime was committed prior to July 1, 1993, Dana was required to file a notice of appeal within 130 days after the oral pronouncement of the sentence from the bench in open court. K.S.A. 22-3608(a); K.S.A. 2001 Supp. 21-4603. See *State v. Ji*, 255 Kan. at 102-04; *State v. Moses*, 227 Kan. 400, 404, 607 P.2d 477 (1980). If the trial court receives a motion for modification within 120 days of the sentencing hearing, it has jurisdiction beyond the 120 days to decide the motion. *Ji*, 255 Kan. at 105; *State ex rel. Owens v. Hodge*, 230 Kan. 804, 814, 641 P.2d 399 (1982). In the event a motion to modify is filed, the triggering event is not the district court's ruling from the bench, but rather the filing of the journal entry. *Ji*, 255 Kan. at 112; *State v. Myers*, 10 Kan. App. 2d 266, 270, 697 P.2d 879 (1985).

Dana failed to file a timely notice of appeal. She was sentenced on January 27, 1997. The trial court orally denied Dana's motion for modification of sentence on November 5, 1998, and memorialized its decision in its order filed November 10, 1998, which was further memorialized in its journal entry filed March 16, 1999. Dana's attorney filed the notice of appeal on January 11, 1999—almost 2 years after the oral sentencing and 2 months after the filing of the order denying the motion to modify.

This court in *State v. Ortiz,* 230 Kan. 733, 736, 640 P.2d 1255 (1982), held there are exceptions to the rule requiring a dismissal following an untimely filed notice of appeal: "where a defendant either was not informed of his or her rights to appeal or was not furnished an attorney to exercise those rights or was furnished an attorney for that purpose who failed to perfect and complete an appeal." There is authority for remanding this case for a hearing to determine whether the *Ortiz* exceptions apply. See *State v. Medina,* 256 Kan. 695, 701, 887 P.2d 105 (1994). However, this court has also held that the exceptions in *Ortiz* apply based on an affidavit alone, rather than a specific factual finding by the lower court. See *State v. Shortey,* 256 Kan. 166, 168, 884 P.2d 426 (1994).

This court issued an order to show cause why the case should not be remanded to the district court for an *Ortiz* hearing. Dana responded and in her affidavit asserted that she wanted to appeal, that she instructed her attorney she wanted to appeal, and that she believed her attorney would file a timely notice of appeal. Under these circumstances, we find an *Ortiz* exception applies, and we will, therefore, consider Dana's appeal.

## 2. Failure to sever conspiracy to commit perjury charge from murder charges

Dana argues the trial court erred in joining the perjury charge with the murder charges in the same trial. Specifically, Dana argues she was prejudiced by the joinder because (1) the joinder allowed the "cross-admissibility" of evidence, *i.e.,* evidence was admitted as to the perjury count that would otherwise have been inadmissible in a separate trial on the murder charges, and (2) the joinder of the perjury charge gave the State license to call Dana, Mikel, and members of their family liars.

K.S.A. 22-3202 provides:

"(1) Two or more crimes may be charged against a defendant in the same complaint, information or indictment in a separate count for each crime if the crimes charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

The standard of review is abuse of discretion. *State v. Barksdale*, 266 Kan. 498, 507, 973 P.2d 165 (1999). See *State v. Crawford*, 255 Kan. 47, 54, 872 P.2d 293 (1994) (holding that the defendant has the burden of showing prejudice requiring reversal); *State v. Shively*, 26 Kan. App. 2d 302, 312, 987 P.2d 1119 (1999) (noting the "minimal" requirements for meeting the connection element of K.S.A. 22-3202[1]).

### Connection between separate charges

In *State v. Moore*, 226 Kan. 747, 602 P.2d 1359 (1979), this court considered the appeal of the defendant who had been tried jointly on two separate district court cases—one case involved aggravated robbery and kidnapping, the other corruptly influencing a witness and unlawful deprivation of property. A trial on the first case ended in a mistrial, and the second case was not filed until after the first case had gone to trial. Upon retrial, the two cases were joined. The second case involved Moore's attempt to secure the false testimony of a witness to aid him in the defense of the first case. He argued that the court erred in consolidating the cases and that the consolidation "unduly prejudiced his defense." 226 Kan. at 749. The State argued that the joinder of the two cases was proper "because the defendant would not have committed the acts giving rise to the corruptly-influencing-a-witness charge but for the aggravated robbery and kidnapping charges." Thus, the State argued that the cases were "necessarily 'connected' and properly joined for trial." 226 Kan. at 749.

The court held it was not an abuse of discretion to join the cases, since the two cases were sufficiently "connected together" under K.S.A. 22-3202 because the first case "precipitated the conduct" in the second case. 226 Kan. at 750.

In *State v. Pondexter*, 234 Kan. 208, 671 P.2d 539 (1983), the court considered the defendant's convictions of aggravated assault of a law enforcement officer, unlawful possession of a firearm, burglary, and attempted murder. The aggravated assault of a law enforcement officer charge and the unlawful possession of a firearm charge arose out of an October 22, 1981, incident in which two undercover police officers tried to purchase drugs from the de-

fendant. The defendant failed to appear for the trial on these two charges, then later the defendant tried to kill one of the undercover officers. The defendant argued the new charges of attempted murder and burglary and the prior charges were separate incidents and joinder would be prejudicial.

Relying on K.S.A. 22-3202, the court concluded:

"The case at bar is factually similar to the situation in *Moore.* Here the evidence presented by the State indicates the appellant wanted to kill Mullikin to prevent him from testifying at his trial for unlawful possession of a firearm and aggravated assault on a law enforcement officer. Clearly the crimes charged in the earlier action precipitated the conduct resulting in the attempted murder and burglary charges. The charges arising out of the two incidents were properly consolidated for trial." 234 Kan. at 217.

In *State v. Walker,* 244 Kan. 275, 768 P.2d 290 (1989), the defendant was convicted of two counts of aggravated criminal sodomy and two counts of endangering a child, based on her abuse of her two stepsons. The defendant was also convicted of one count of making a terroristic threat. The threat charge arose out of her comments to a hospital social worker after she was not allowed to visit one of the victims, who had been admitted to a psychiatric hospital. The defendant argued the trial court erred in consolidating the threat charges with the charges involving her stepsons.

The court acknowledged that the charge of terroristic threat and the charges involving the defendant's stepsons were not of the "same or similar character or based upon the same acts or transactions"; however, the court noted the State's argument—based on *Moore* and *Pondexter*—that the charges merely need be "connected together." 244 Kan. at 278. The *Walker* court noted that the defendant's case was not as strong as *Moore* and *Pondexter,* but that the charges were sufficiently "connected together" because the charges of aggravated criminal sodomy and endangering a child precipitated the threat charges. 244 Kan. at 279. Moreover, the defendant failed to "demonstrate prejudice which would justify reversal." 244 Kan. at 280.

*State v. Anthony,* 257 Kan. 1003, 898 P.2d 1109 (1995), also rejected an argument that the joinder of the defendant's charges for premeditated first-degree murder, aggravated robbery, sale of

cocaine within 1,000 feet of a school, and unlawful possession of a firearm was improper. On the murder and robbery charges, the defendant was jointly tried with two other defendants. The drug charge was based on evidence gathered during a drug sting operation involving a confidential informant. The night following the murder and robbery of a motel night clerk, the defendant visited the drug sting confidential informant to sell drugs. While there, the defendant made statements linking himself to the robbery and murder of the motel night clerk. On appeal, the defendant argued the trial court erred in refusing to sever the sale of cocaine from the murder and robbery charges.

The court focused on the "connected together" language in K.S.A. 22-3202. *Anthony* concluded that even though

"the robbery and murder are separate and distinct charges from the sale of cocaine and unlawful possession of a firearm charges, all the charges are connected together. . . . The connection between the selling of cocaine and possession of the weapon on the one hand and the motel murder and robbery on the other hand is real and substantial enough to allow·joinder. At the very least, we believe that reasonable persons could disagree on the ruling of the trial court, and we do not, therefore, find an abuse of discretion in granting joinder." 257 Kan. at 1016-17.

The connection in this case was substantial. The perjury was designed to conceal beliefs that God would take care of the victim, that the victim was evil, and that it was not God's will that the victim have custody of A.S. These beliefs established a motive for killing the victim, thus the connection under K.S.A. 22-3202(1) provided a sound basis for joinder.

### *Admission and prejudice—inadmissible evidence*

This court in *State v. Cromwell,* 253 Kan. 495, 511-12, 856 P.2d 1299 (1993), resolved an attack to the joinder of multiple crimes in one trial by noting that where evidence objected to would have been admissible under K.S.A. 60-455, no error occurs in forming separate charges. Dana relies on *United States v. Lewis,* 787 F.2d 1318 (9th Cir. 1986), and *Bean v. Calderon,* 163 F.3d 1073 (9th Cir. 1998), for the proposition that when charges are joined for trial and evidence on one charge is not admissible on the other charge, there is a high likelihood of undue prejudice.

The defendant in *Lewis* argued the trial court abused its discretion in refusing to sever a receipt of firearm count from the charges of larceny and murder because his prior felony conviction would not have been admissible in separate trials. The test, according to *Lewis*, was whether the prejudice was "of such a magnitude that the defendant's right to a fair trial was abridged." 787 F.2d at 1321. The court reversed the murder conviction, noting that "[t]here is 'a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible.' " 787 F.2d at 1321 (quoting *United States v. Daniels*, 770 F.2d 111, 1116 [D.C. Cir. 1985]). The *Lewis* court explained that the reason for this was that "[i]t is much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts [citation omitted] than it is to compartmentalize evidence against separate defendants joined for trial." 787 F.2d at 1322.

In *Bean*, the defendant was convicted by a California state court of two counts each of first-degree murder, robbery, and burglary as to two separate victims, Schatz and Fox, and Bean was sentenced to death. The California Supreme Court affirmed the conviction, and Bean filed a federal habeas corpus action. The *Bean* court concluded that the "joinder of the Schatz and Fox indictments deprived Bean of a fundamentally fair trial on the Fox charges." 163 F.3d at 1083. The Fox case was relatively weak compared with the evidence from the Schatz case and the *Bean* court held that joinder of the weak case with the strong case permitted the jury to "infer criminal propensity." 163 F.3d at 1083.

Unlike *Lewis*, the evidence of perjury in this case was admissible both under K.S.A. 60-455 and independent of K.S.A. 60-455. It related to the victim, the attitude of Dana's church towards the victim, and the support Dana gained from her pastor and church members for preventing the victim's visitation of A.S. at any cost. Independent of 60-455, the evidence related directly to the motive for eliminating the victim from the life of A.S.

Unlike *Bean*, the case we now consider raises no concerns for an inference of criminal propensity. The perjury charge was oc-

curring just prior to the murder charge. Both were inextricably connected, with the latter growing out of the perjury charge. Given such a connection, and the unquestioned admissibility of the perjury evidence, we conclude that the court did not abuse its discretion in joining the separate charges for trial. Finally, we note that the court instructed the jury to consider the charges separately "uninfluenced by [its] decision as to any other charge."

## 3. Sufficiency of Evidence

*Premeditated murder and conspiracy to commit murder*

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Jamison,* 269 Kan. 564, 571, 7 P.3d 1204 (2000). Moreover, "[a] guilty verdict in a criminal case will not be disturbed on appeal if there is substantial evidence, even though the evidence is entirely circumstantial." *State v. Scott,* 271 Kan. 103, 107, 21 P.3d 516, *cert. denied* 534 U.S. 1047 (2001).

Dana contends that the State's theory that she and Mikel were influenced by Pastor Rollins' prophesies would not be accepted by any rational jury. Dana argues that the testimony of Lucille Johnson regarding the carwash should be discounted both because the testimony was incredible and because Johnson had a motive to lie. She attacks the probative value of Mikel's failed attempts to establish alibis for himself and his sister because there was no evidence presented to show that she knew about the alibis. She also argues the State presented no evidence linking her to Mikel's telephone call. According to Dana, the State presented insufficient evidence showing she had perjured herself for the purpose of covering up Randy's murder. Dana argues the jury verdict should be rejected according to *State v. Doyle,* 201 Kan. 469, 487, 441 P.2d 846 (1968), which held that motive alone is insufficient to sustain a conviction. In any event, she asserts that many others had a motive to kill Randy. Finally, Dana argues the tiny bits of irrelevant evi-

dence do not collectively amount to relevant evidence with which the jury could have reasonably convicted her.

The facts leading to Randy's death demonstrate a number of motives why Dana wanted Randy out of her life. However, the court instructed the jury that motive alone was insufficient: "A finding of guilty for the crime of murder may not be based solely upon evidence of motive. Rather each element of the crime must be proved beyond reasonable doubt." The court also instructed the jury that inferences alone were not sufficient to establish any elements of any of the crimes: "You may not find an element of a crime from an inference that is based solely upon an inference. However, you may draw reasonable inferences from facts established in the evidence."

The evidence established that Dana needed a way out of the custody litigation with Randy for a number of reasons. First, Randy, with the critical help of Pottroff, had maneuvered Dana into a corner. She had lied about not spending any significant time with Pastor Rollins. Randy and Pottroff knew this to be a lie; therefore, Pottroff crafted a court order to restrain A.S. from associating with Pastor Rollins, thereby putting Dana in the difficult position between choosing between her daughter and the man she wanted to marry. Second, the litigation against Randy was not going Dana's way. Kansas Department of Social and Rehabilitation Services (SRS) social workers were concerned about the past allegations of sexual abuse. Finally, the evidence demonstrated that SRS was concerned Dana had coached A.S. to make untruthful allegations. SRS considered this coaching to be emotionally harmful to A.S., and it could have been grounds for Dana to lose custody of A.S.

In addition to motive evidence, the circumstantial evidence inevitably led to Dana and Mikel.

The December 7, 1992, threat to Steve Flynn was significant. Steve and Randy were similarly situated in that they both had a child with Dana, they both were fighting Dana over custody and supervision, and they both had a young child who believed their respective father was evil based on Dana's statements. When Steve pushed Dana too far with regard to J.F., Dana arrived at Steve's place of work with Mikel and a heated confrontation followed. Mi-

kel threatened Steve with the "I'm going to take you down" language, and Dana responded by telling Mikel that it was not the appropriate time to take Steve down. Mikel attempted to explain that as a former wrestler, he had used the "take down" language to refer to a seemingly innocuous wrestling maneuver. However, the inference that Mikel intended his statement to be a life-threatening statement was equally supported and, with other evidence, became the likely intent.

The December 12, 1992, telephone call, viewed in the light most favorable to the State, was significant. First, the jury could reasonably conclude the telephone call was a death threat from Mikel to Randy. Judith testified she heard the words "die" or "dead." Judith also heard Randy refer to the caller as "Mikey," a derogative term Randy used for Mikel. The jury could have reasonably concluded the telephone call was a forecast, *i.e.*, "drop the custody fight or you are dead." The evidence showed that Randy was proceeding with the custody battle, which was causing Dana concerns regarding her desire for sole custody of A.S. and her relationship with Pastor Rollins. Dana stated she would "do anything" to keep Randy from getting custody of A.S.

The testimony of Randy's attorney provided evidence that despite court orders for extended visitation, Dana did not intend on letting Randy have custody of A.S.

The State presented evidence of Dana's opportunity to commit this crime. She left work shortly after noon on December 22, 1992, after having a telephone conversation with her lawyer, the bearer of bad news in terms of the custody battle. The evidence showed it was likely Dana knew through her attorney that Randy was home that day. Her own statements following the murder established that she had purchased fuel for her car and telephoned her mother from a payphone to arrange for someone to pick up the children. Mikel's statements established that he was with his sister that afternoon, which likewise establishes his opportunity to commit this crime.

Admittedly, there was nothing at the scene of the crime to link the murder to either Dana or Mikel. However, the evidence of Dana's actions after the murder further strengthen the conclusion

that the jury acted reasonably in convicting her. After Randy's murder, the evidence showed Dana had driven her car through an automatic carwash twice. This evidence was sufficient to allow the jury to arrive at a logical conclusion that Dana's car was soiled with either Randy's blood or dirt from the road. Further, the evidence showed that after the murder Dana stated Randy was an evil, wicked man who deserved to die.

In considering the sufficiency of evidence to sustain a conviction, this court reviews all the evidence, viewed in the light most favorable to the prosecution. *Jamison*, 269 Kan. at 571. In light of this standard, we are convinced a rational factfinder could have found, beyond a reasonable doubt, that Dana was guilty of the murder of Randy Sheridan.

### *Conspiracy to commit perjury*

Dana briefly argues the evidence was also insufficient to sustain the conspiracy to commit perjury conviction. She contends that the State failed to establish that the overt act (the perjury) involved a material fact.

The court defined perjury for the jury as the "willful, knowing, and false testifying or swearing to a material fact upon oath legally administered by a person authorized to give oaths." The court defined "material fact" as "a fact which has a natural tendency to influence, or was capable of influencing, the decision making body to which it was addressed. It need not bear directly on the ultimate issue to be determined in the cause or hearing."

Current members of Dana's church testified that praying in tongues did not occur at the church. However, past members of the Fountain of Life Church testified that the practices of speaking in tongues and prophesy were practiced at the church. The jury could reasonably infer from the evidence that the repetitive and consistent nature of the lying, over facially insignificant facts, showed that an agreement had been struck between Dana, Pastor Rollins, and present church members.

Any statement relevant to the matter under investigation is sufficiently material to form the basis of a charge of perjury. The test of materiality is whether a false statement can influence the tri-

bunal—not whether it does. *State v. Rollins,* 264 Kan. 466, 471, 957 P.2d 438 (1998). The concealed statements had the potential of implicating Dana in Randy's murder; thus, the statements were relevant. Moreover, the concealment was capable of influencing the outcome of the inquisition. Thus, the statements underlying the perjury conspiracy were material as a matter of law.

There is sufficient credible evidence that Dana, with others, agreed to and did, present false testimony before the inquisition.

## 4. Prosecutorial misconduct and denial of fair trial

Dana argues that prosecutorial misconduct during the trial denied her a fair trial. She argues: (1) The prosecutor improperly commented on her credibility and that of her family, (2) the prosecutor compelled Mikel to comment on the credibility of the State's witnesses, (3) the prosecutor improperly commented on her defense theory, (4) the prosecutor elicited improper testimony from Randy's wife, Judith, (5) the prosecutor improperly elicited evidence of Jennifer and Shirley's prearrest silence, and (6) the cumulative misconduct along with the weak evidence of her guilt should result in a new trial.

*State v. Pabst,* 268 Kan. 501, 505, 996 P.2d 321 (2000), sets forth our standard of review for consideration of prosecutorial misconduct during closing arguments:

"The analysis of the effect of a prosecutor's alleged improper remarks in closing argument is a two-step process. First, we decide whether the remarks were outside the considerable latitude the prosecutor is allowed in discussing the evidence. In criminal trials, the prosecution is given wide latitude in language and in manner or presentation of closing argument as long as the argument is consistent with the evidence. Second, we must decide whether the remarks constitute plain error; that is, whether they are so gross and flagrant as to prejudice the jury against the accused and deny a fair trial, requiring reversal. [Citation omitted.]"

The factors for appellate court consideration to determine whether a new trial should be granted because of prosecutorial misconduct are: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial, (2) whether the remarks show ill will on the prosecutor's part, and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the

misconduct would likely have little weight in the minds of the jurors. 268 Kan. at 508. Normally, there can be no reversible error based on prosecutorial misconduct absent a contemporaneous objection. *State v. McCorkendale*, 267 Kan. 263, 278, 979 P.2d 1239 (1999). However, "[i]f the prosecutor's statements . . . rise to the level of violating a defendant's right to a fair trial and deny a defendant his or her Fourteenth Amendment right to due process, reversible error occurs despite the lack of a contemporaneous objection." 267 Kan. at 278.

### *Calling witnesses at inquisition and grand jury liars*

In closing arguments, the State made the following argument:

"Question comes to mind, ladies and gentlemen, *what are they lying about?* You've got a fundamental religious practice, which is your right, 'Yeah, we pray in tongues. It's our belief. We believe in that.' *They're lying about it. They're lying about it, ladies and gentlemen, for a very good reason.*"

. . . .

"Well, you've heard the testimony about that from other people who attended the church. Was it regular practice? Common Pentecostal practice. Everyone knows what we're talking about.

*"They're lying about it.* 'The congregation did not engage in that practice.' 'I'm not sure.' 'I don't quite understand.' 'What do you mean by that?' And, 'I can't speak for everyone else, but the answer to Pastor Jerry Rollins is no, the times that I have been.'

"Norman Dreiling. Here's a good one. Norman's part of the conspiracy to lie, but Norman was asked, apparently, a little bit different kind of question. We asked Dad, who's sitting next to Mom at church on a regular basis, Dad didn't quite understand what he was supposed to lie about, apparently.

" 'Do you know where your wife attends church?'

" 'No.'

" 'Do you know whether your wife is actively involved in church?'

" 'No.'

"Dad didn't get the message, apparently, *he was supposed to be lying about praying in tongues, and he went so far as to lie about the fact the woman he sat next to in church every Sunday, he didn't know where she went to church, he didn't know he was actively involved with her or not in the church.* So, some things don't always work as planned, and the same is true of conspiracy." (Emphasis added.)

The State then discussed the inconsistent inquisition or grand jury testimony of Charles and Lee Anna Rollins; the wiretapped

conversation between Pastor Rollins and his daughter, Kathlyn; and the inconsistent statements of Mikel and his wife, Jennifer. The prosecutor stated: "It's obvious at this point, ladies and gentlemen, these inconsistent statements, they're lying." The prosecutor pointed out how Jennifer's grand jury testimony was evasive and had denied that the members of the Fountain of Life Church spoke in tongues. The prosecutor discussed Mikel's testimony during the trial regarding the church members' practices and how that testimony was inconsistent with what his wife had said during the grand jury proceeding. The prosecutor, after discussing all these inconsistencies, argued to the jury the relevance of all this:

"I guess if you don't pray in tongues and you don't prophesy, you don't have all these statements about Randy Sheridan and you don't have all these prophecies about his being evil.

"There was no reason under the sun to lie about that. It's a religious belief. *There's no reason in the world for them to come in and lie about something like that.* They're protecting, ladies and gentlemen. It's the bottom line.

. . . .

"And then, when you get people in cowered under subpoena, look at the answers they give, the members of the church, *and look at the specific answers they're lying about.* Now, why are they doing that? What are they hiding?" (Emphasis added.)

The prosecutor discussed the attempts to secure false alibis:

"Then we have the false alibis. 'I'm not going to tell you what really happened, because I'm concerned about the fact that we got this room for 25 bucks. I'm going to go to the trouble to go out and try to buy someone to come in here and testify about where I really wasn't. I'm not going to tell you where I really was, but I'm going to go buy somebody to come in here and tell you where I really wasn't.' That's what Mike Dreiling did.

" 'Don't talk to the KBI.'

"*And all these people are lying.* It's all very consistent, ladies and gentlemen, with what occurred in this particular case."

Dana also complains of the following argument by the prosecutor regarding the threatening telephone call to Randy:

"Now, they've raised the question, why isn't Charles called about this phone call? Charles, the buddy in the conspiracy, Charles, the guy that's lied under oath, along with other members of the church and family at the inquisition, sure, we're going to call Charles and let him tell you whether he did or didn't make the phone call."

There were no contemporaneous objections to any of the above arguments.

In *Pabst,* the court held the prosecutor committed reversible error when he argued to the jury that the defendant lied. 268 Kan. at 506. Unlike *Pabst,* one of the charges in this case was conspiracy to commit perjury, which required the prosecutor to present evidence that witnesses had presented false testimony. The argument related to the evidence presented that witnesses at the inquisition had presented false testimony, and the prosecutor's argument was a comment on that evidence. Under these particular circumstances, we conclude that Dana was not denied her right to a fair trial or her Fourteenth Amendment rights to due process.

### *Compelling Mikel to testify regarding the credibility of law enforcement officers' testimony*

Dana complains of the following cross-examination of Mikel by the prosecutor:

"Q. "Did you have muscle spasms in your chest?
"A. No, not that I remember.
"Q. *So, they would be incorrect about that?*
"A. Yeah, they would.
"Q. Were you gasping for air at any time during that interview?
"A. No.
"Q. *So, they would be incorrect about that?*
"A. Yeah." (Emphasis added.)

Dana also complains of the following:

"Q. [Prosecutor:] Well, what you told them on that occasion is you went by Dana's, to see if she was home, didn't you?
"A.[Mikel:] No.
"Q. *So, the investigators would be incorrect about that?*
"A. I said I went by my sister's house. That would have been Brenda. That's where Jennifer was staying, we were moving things from.
"Q. So, they indicated you went by Dana's house, that would be incorrect?
"A. They might have assumed that.
"Q. *They would be incorrect?*
"A. Yeah.
. . . .
"Q. Did you tell the officers that you waited at Dana's house for her?
"A. No.

"Q. *So, they're incorrect about that?*

"A. Yeah, they're incorrect.

. . . .

"Q. But, you also told the officers that you saw [Dana] at her house, I believe?

"A. No.

"Q. *So, they would be incorrect about that?*

"A. Yeah, they would.

"Q. And you also told them that you were with her, referring to Dana, sometime between 12 noon and 3:45 in the afternoon, correct?

"A. I don't know if I told them that. I probably told them 3:45. That's when I got dropped off at Mom's house.

"Q. *So, they would be incorrect--*

"A. Yeah.

"Q. —about the statement that you told—

"A. Yeah.

"Q. —the agents that you were with Dana sometime between 12:00 and 3:45?

"A. Well, I told them the afternoon, and I gave them approximate time, I thought, 3:45, 3:50, something like that." (Emphasis added.)

There were no objections to any of this questioning. However, it was improper to ask the witness whether other witnesses had lied or were mistaken. See *State v. Diggs,* 272 Kan. 349, 361-62, 34 P.3d 63 (2001). While the court in *Diggs* held that the prosecutor committed misconduct by asking the defendant whether other witnesses had lied or were mistaken was error, the court did not reverse the conviction, finding that the questions did not prejudice the jury against the defendant and did not deny her a fair trial. In this case, while the prosecutor improperly asked Mikel whether other witnesses were incorrect, we find that the prosecutor's questions were not so gross and flagrant as to deny Dana a fair trial.

### *Calling the defense theory unreasonable and absurd*

Dana argues the following argument by the prosecutor improperly denied the importance of her defense theory in two areas. First, the prosecutor said: "The defense in this case, ladies and gentlemen, is an *absurd representation and excuse as to what happened.* The State could not have set in motion all these strange, bizarre, complicated facts if we had tried." (Emphasis added.) Second, and much later, the prosecutor said:

"The defense position in this case, ladies and gentlemen, and what they have given to you as a jury is *totally unreasonable and it is absurd*, and if you believe, ladies and gentlemen, that Mike Dreiling was telling the truth, then, yeah, you've got to acquit him, but you have the ability to weigh and judge the credibility of the witnesses." (Emphasis added.)

There was no objection to this argument.

Dana cites *State v. Hart*, 94 Ohio App. 3d 665, 641 N.E.2d 755 (1994). *Hart* involved Earl Hart's conviction for aggravated murder and aggravated burglary. The court on appeal reversed Hart's conviction based on numerous incidents of prosecutorial misconduct, thereby denying Hart's due process rights to a fair trial. 94 Ohio App. 3d at 676. During the prosecutor's rebuttal closing argument, the prosecutor expressed his outrage that the defense would deny the purpose of the burglary was to rape the victim, despite the fact that the victim's legs were found spread and her clothing was found disheveled, with her pajama top open and her pants pulled down to just above her knees: "They have the nerve to suggest that you cannot infer that there was a purpose to rape this lady." 94 Ohio App. 3d 669, 673-74. The prosecutor also argued: " 'And when you think about that you gain valuable insight into their whole method of operation. Crank up the fog machine. Let's try to conjure up a reasonable doubt.' " 94 Ohio App. 3d at 674.

In *Hart*, while affirming that a prosecutor can "argue ardently that the evidence does not support the conclusion postulated by defense counsel," the court stated that a prosecutor is not permitted to "denigrate the role of defense counsel by injecting his personal frustration with defense tactics." 94 Ohio App. 3d at 673-74.

Unlike *Hart*, the prosecutor in this case pointed out how unbelievable Mikel's and Dana's explanations were. The inference that the explanations were a fabrication was for the jury to decide. The prosecutor in *Hart* made this inference an assertion with the "crank up the fog machine" language, but the prosecutor in this present case was only commenting on the unbelievable nature of the defendants' stories. We conclude the above arguments, to which Dana failed to object, were not in error.

*Violation of rule in* State v. Donesay, *265 Kan. 60, 959 P.2d 862 (1998)*

Dana argues the prosecutor committed misconduct when he asked Judith Sheridan about her relationship with the victim:

"Q. Ma'am, I have just another—another question for you. Concerning the nature of your relationship with Randy Sheridan in December of 1992, what was your relationship with him like?

"A. It was very good. As far as our relationship goes, it was—I mean, probably the last few years since he'd moved home had been very good.

. . . .

"Q. And did you have an opinion about the kind of father that Randy was?

"A. He was very concerned, very involved, certainly more than—more than your average, and he took pride in that. It was—he was—he was an unusual father, and I'm sure that was probably the reason why he was killed. He wasn't one of these fathers that never paid, you know, never cared about their child, didn't want any involvement in it, their lives.

"Q. And did you agree with his attempts to keep [A.S.] as part of your life?

"A. Wholeheartedly, yes."

There was no objection to this testimony.

In *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998), the defendant appealed his jury convictions of premeditated murder, aggravated robbery, criminal damage to property, two counts of felony theft, and criminal possession of a firearm. The murder conviction was based on the death of a police officer shot while pursuing Donesay. The court considered whether the trial court erred in admitting testimony of the victim's widow. She testified about her husband's career, about how happy he was, and about how everyone who met him liked him. Donesay argued the evidence was "irrelevant and served only to inflame the passions of the jurors." 265 Kan. at 82. This court agreed, holding it was error to admit the evidence and that the error was not harmless. This court found that the evidence was collateral to the charges against Donesay because the only issue at trial was whether the murder was premeditated. 265 Kan. at 85-89.

The evidence in this case is readily distinguishable. The prosecutor did not commit misconduct with the above questions. Unlike the evidence in *Donesay*, where the evidence was "obviously collateral to the charges against the defendant," the evidence in the

present case was relevant to dispel the notion that Randy was a child molester. The State presented evidence that Dana had made allegations that Randy was molesting A.S.; therefore, the evidence of Randy's relationship with A.S. was relevant to show the falsity of these allegations.

Moreover, the evidence explains why Randy would want to be involved in A.S.'s life. The evidence shows Randy had attempted through the legal system to spend more time with A.S. Judith's testimony explained to the jury why Randy was trying so hard to get custody of his daughter. As it was the State's theory at trial that Randy's desire to be around his daughter eventually pushed Dana and Mikel to murder him, the evidence of his relationship with his daughter was relevant.

### Eliciting alleged coconspirators' prearrest silence

Dana argues the prosecutor committed prosecutorial misconduct when he elicited evidence that Mikel's wife, Jennifer, and Mikel and Dana's mother, Shirley, refused to speak with Agent Brandau. Agent Brandau testified as follows:

"Q. Did you attempt to talk to Jennifer Dreiling?
"A. Yes, sir.
"Q. At that time what was her name?
"A. Jennifer Brock.
"Q. And were attempts made to you knowledge to talk to Shirley Dreiling?
"A. Yes, sir.
"Q. And was the KBI able to obtain any information from them?
"A. No.
"Q. And why was that?
"A. They refused to speak to us."

There was no contemporaneous objection made. However, we perceive no prejudice to the defendant flowing from testimony concerning the witnesses' refusal to speak to Agent Brandau. Dana alleges that an inference they were hiding material evidence prejudiced her right to a fair trial. Yet, many inferences were possible including sorrow or anger. The reasons for refusal were not known or explained at trial. The refusal of a witness to discuss a case with the investigating officers standing alone is not prejudicial. The cases relied on by Dana all deal with comments on a defendant's

silence or failure to respond. Thus, they provide no authority for concluding that prosecutorial misconduct occurred in this case. We are left with Dana's allegations of misconduct, which allegations fail to establish reversible error.

### *Cumulative prosecutorial misconduct*

Dana argues that the cumulative prosecutorial misconduct, considering the circumstantial evidence used in this case, makes the errors reversible. The second step in the analytical framework discussed in *Pabst* involved an analysis of "whether the prosecutor's improper comments denied [the defendant] a fair trial by unfairly prejudicing the jury against him." 268 Kan. at 507. Relevant factors include: (1) whether the misconduct was so gross and flagrant to deny the defendant a fair trial, (2) whether the misconduct showed ill will on the part of the prosecutor, and (3) whether the other evidence was sufficiently strong that the misconduct would have had little effect on the jury. 268 Kan. at 508.

First, as shown above, many of the alleged instances of misconduct were not misconduct at all, but rather permissible argument or admissible evidence based on the unique facts of this case. Second, there was no evidence the alleged misconduct showed ill will on the part of this prosecutor. This case was tried over 3 months, resulting in thousands of pages of transcription. The isolated instances shown above do not reveal a concerted effort on the part of this prosecutor to deny Dana a fair trial. Finally, we conclude that the errors which did occur would not have changed the verdict. We further conclude beyond a reasonable doubt that such errors had little, if any, effect on the verdict rendered.

## 5. Erroneous admission of evidence

Dana argues the trial court improperly admitted irrelevant and inflammatory evidence. Specifically, Dana argues the trial court erred in admitting evidence of (1) prophesies regarding Lucille Johnson, (2) J.F.'s statements involving the devil, (3) Dana's cold and manipulative nature, (4) the fears of the State's witnesses, (5) A.S.'s brainwashing, (6) Pastor Rollins' sex toys, (7) SRS's conclusion regarding Dana's credibility, (8) Mikel's confrontation with

Steve Flynn, (9) Steve Flynn's custody dispute with Dana, (10) the conclusions of the State's witnesses on the ultimate question, and (11) lies about the prophesies and speaking in tongues.

"It is well settled that a timely and specific objection to the admission of evidence at trial must be made in order to preserve that issue for appeal." *State v. Barksdale,* 266 Kan. 498, 511, 973 P.2d 165 (1999); K.S.A. 60-404. Further, all relevant evidence is admissible. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevancy is more a matter of logic and experience than of law. Evidence is relevant if it renders the desired inference more probable than it would be without the evidence, or if it has any tendency in reason to prove any material fact. *State v. Sexton,* 256 Kan. 344, 349, 886 P.2d 811 (1994). Where the probative value of evidence is substantially outweighed by the risk of unfair prejudice, even relevant evidence may be excluded by the judge. *State v. Lee,* 266 Kan. 804, 813, 977 P.2d 263 (1999).

The standard of review for the admission of evidence is well known:

"The admission of evidence lies in the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. [Citations omitted.]" *State v. Whitesell,* 270 Kan. 259, 276-77, 13 P.3d 887 (2000).

### *The Lucille Johnson prophesies*

Dana complains the evidence of four of Pastor Rollins' prophecies was improperly admitted: (1) Lucille Johnson's husband would not recover unless Johnson gave Pastor Rollins money, (2) Johnson should buy a house and a church for Pastor Rollins in Salina, (3) Johnson was not giving enough money to the church, and (4) Johnson was evil.

Johnson testified that Pastor Rollins traveled from Texas to Kansas to pray for her ill husband. According to Johnson, Pastor Rollins prophesied that if her husband "didn't give him money, he

wouldn't be healed." After Pastor Rollins moved to Salina, Johnson purchased a church for Pastor Rollins. She explained the reason: "A prophecy was given that I was to buy that church." The church cost $125,000. Johnson also purchased a house for Pastor in Salina because, according to him, it was God's will:

"Q. And what were you told, ma'am?
"A. That I was to purchase his home. That was what God had told him to tell me, that I was to purchase this home."

The home cost Johnson $89,000. The State also presented evidence of these prophecies through Lee Anna, Pastor Rollins' former wife. According to Lee Anna, Pastor Rollins would dictate the prophecy and Lee Anna would write it. Lee Anna testified that after these prophecies, Johnson purchased a house and a church for Pastor Rollins.

Lee Anna also testified regarding a prophecy from June 1987. Again, Pastor Rollins dictated the prophecy to Lee Anna:

"Verily I say to thee, my daughter, Lucille, my servant has left my church with many souls, houses and land and children for thy sake to be with thee and just to strengthen thee, and thou has left nothing for me. Ye have not even fulfilled thy promise to give unto the Lord thy God even the half of thy goods which ye did promise me. How saith that thou lovest me? Behold, I said and did demand that the rich, young ruler give all and follow me. And even so I demand the same of thee. Yea, thou art like him. Yet ye are not rich. Ye are like him and are not willing. Therefore, I shall take my servant and send him from thee. I will send him away from thee to another people and my voice shall not be heard unto thee hereafter, saith the Lord, except ye quickly, this day, prove thyself unto me. I am the Lord of hosts forever and ever. Who shall escape me? Choose ye this day whom ye will serve, thyself or me. Behold, thou art selfish indeed. What wilt ye do when ye come before me in judgment, or what shall ye do if I judge thee now and take thy life from thee? Where wilt thou spend eternity?"

The fourth prophecy complained of by Dana on appeal was the last straw for Johnson and was described by Lee Anna for the jury as a "very, very hard prophecy" delivered to Johnson during a church service:

"I remember he prophesied to her from God that God was very angry with her, very displeased. I don't recall what she had supposedly disobeyed God about, because she had already purchased the church, but they—well, I'm going into more than the answer."

Pastor Rollins also described Johnson as evil. Following this incident, according to Lee Anna, the members of the church began to shun Johnson. Members would not talk to her at church and would not sit by her at church. These members included Dana; her sisters, Brenda, Sheryl, and Sue; and Pastor Rollins' sons, David and Charles.

The State argues the evidence of the prophecies regarding Johnson were relevant examples demonstrating for the jury the type of thought control exhibited within the Fountain of Life Church. The relevance of these events is evident. They demonstrate by prior example the link between Pastor Rollins' prophecies and actual action taken by the church members.

The trial court did not abuse its discretion in admitting evidence of Pastor Rollins' prophecies which involved Johnson. The State established a pattern with the prophecies; each prophecy was followed by action by the church members, of which group Dana and Mikel counted themselves. In Johnson's case, the prophecies at first encouraged her to give money and then later led other members to shun her. Likewise, the prophecies provided relevant evidence as to why Dana and Mikel would kill Randy. Pastor Rollins had called Randy evil and announced that it was not in God's will for Randy to see his daughter.

### J.F.'s references to the devil

Dana asserts it was error for the State to present evidence of J.F.'s statements that his father was evil and that his father was the devil. As the factual summary above demonstrates, the State presented Steve's testimony describing J.F.'s statements that Steve and various other people either serve or indeed are the devil.

The statements were relevant because they were part of the custody battle, which, according to the State's theory in this case, was the motive for the crime. J.F.'s statements helped the jury understand why Randy and Steve would have joined forces and why Randy and attorney Pottroff would have worked to get a restraining order preventing Pastor Rollins from having contact with Randy's daughter, A.S.

### Descriptions of Dana as cold and manipulative

Dana argues the State presented improper character evidence through the testimony of her coworker, Mary Kirk. On direct examination, Kirk responded to the prosecutor's question of whether Dana received special arrangements at work:

"A. In—during the catalog season, we would always need extra help in the evening, somebody would have to come in from 5:00 to 9:00, and we would hire someone to do that.

"Well, the year after, would have been in '93, she came and asked if she could do that, if she could work the part-time, the evening shift for the catalog. And I said, well, no, that we couldn't do that, because with her working with us, she would be getting overtime, and we only paid five dollars an hour for the person to come in and do that, normally, and with her getting paid overtime, it would cost the company more money.

"And so, then she went to the vice president of manufacturing and talked to him, and he got it okayed, so then that year she was working in her regular job from 8:00 to 5:00, and then she would come down and from 5:00 to 9:00 and she would answer the telephone for the catalog.

"Q. And were there other employees that were allowed that opportunity?

"A. No, not that I know of."

Dana's objection was overruled. The State then tried to show how Dana's privilege related to the way Dana related to men. Kirk testified:

"She was very cold—not cold, she was—she would—she didn't hardly talk to the women, at all, but she'd always have—you know, be real jovial to the—not—to the men and say good morning and visit with them, but as far as women, she was just kind of—"

At this point, the prosecutor cut off the witness. The defense counsel objected, and the trial court said that it understood the objection. Dana's attorney moved for a mistrial, which was denied by the trial court.

While the testimony is not relevant to the issues to be decided in the trial, we find the statement to be harmless in light of the trial as a whole. K.S.A. 60-261 provides as follows:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless

refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

See *State v. Mullins,* 267 Kan. 84, 97, 977 P.2d 931 (1999). We conclude that this trial, which consumed over 8 weeks and involved the testimony of over 80 witnesses, was not tainted by Kirk's testimony.

### Evidence of the fears others had of Dana and Mikel

Dana contends that the court erroneously admitted evidence that others were afraid of her and her family.

Attorney Pottroff explained why the weekend before the murder he met with the witnesses who were going to testify in the custody case as a group: "One was the witness, who had told me that they had fear, that they were afraid of repercussions, afraid for their own safety." At this point, Mikel's contemporaneous objection was sustained. Pottroff testified that after learning of Randy's death, he called the Geary County sheriff's department "to express to them some of the fears that my witnesses had expressed to me on the weekend." Again, Mikel's objection was sustained and the jury was ordered to "[d]isregard the fears that some others may have." The admonition to the jury in this case cured any prejudice from an improper admission of evidence. *State v. Navarro,* 272 Kan. 573, Syl. ¶ 6, 35 P.3d 802 (2001).

Pottroff also described the fears expressed by Lee Anna, Pastor Rollins' ex-wife. Pottroff testified he wanted to preserve some testimony, and the prosecutor asked him to describe what he meant by that statement:

"A. If you're not sure if somebody's going to be available as a witness, or for whatever reason you have evidence that you want to make sure you get documented by a court reporter, you can preserve that testimony under oath and—
"Q. Who else's testimony did you take on the 21st?
"A. Lee Ann Rollins.
"Q. Who is she?
"A. The—she may have been the ex-wife at the time of—that was Jerry Rollins' wife or recently divorced ex-wife.
"Q. And why did you perpetuate her testimony on the 21st?
"A. For a couple of reasons.

"Q. And what were those?
"A. One, her fear—
"[Mikel's attorney:] Again, Your Honor, we're talking about—
"[Prosecutor:] Your Honor, she's going to testify. She'll be here to testify herself. This explains his actions in this case.
"[THE COURT:] If she's going to be here and is available for cross-examination, I'll let him testify.
. . . .
"A. She feared for her safety.
"Q. And what did that have to do with deposing her testimony?
"A. I told her that if I got her testimony and preserved it and she really had a legitimate fear that she was going to be killed that that would take away a lot of the reason for her to be taken out, because I would have her testimony, and if it was the testimony that somebody was trying to prevent, I would have that, regardless of whether or not she survived. She felt like that was a safety factor."

Dana failed to lodge a specific contemporaneous objection citing the grounds now raised on appeal. A generic objection is insufficient to preserve the issue of the erroneous admission of evidence for appeal. See *State v. Leitner,* 272 Kan. 398, 423, 34 P.3d 42 (2001).

Dana argues on appeal that the trial court overruled an objection to Lee Anna's having testified about her fears. However, the record does not support the contention that the objection was to Lee Anna's testimony of her fears.

Dana also objects to the testimony of Sergeant Redmond, who testified about visiting Larry and Ann Kohman's house prior to the December 22, 1992, interview of Pastor Rollins. Larry and Ann Kohman are neighbors of Pastor Rollins. Sergeant Redmond testified she went to the Kohman's house because "Mrs. Kohman requested a standby, while she got some of her belongings and left the residence." Mikel's objection was immediately sustained. Sergeant Redmond's testimony gave the jury the impression that Ann Kohman was afraid Pastor Rollins would hurt her.

Setting aside the testimony that was introduced without a contemporaneous specific objection and also the testimony that was introduced but stricken and the jury admonished to ignore, we conclude the evidence that witnesses were frightened was harmless in light of the trial as a whole.

### Evidence of brainwashing

Dana argues the trial court erred in admitting Judith Sheridan's testimony that A.S. was being brainwashed. The prosecutor asked Judith to explain why Randy hired attorney Pottroff:

"One of the biggest concerns that—that Randy had was the fact that his child—he felt like his child was being brainwashed, and he wanted to have a custody evaluation, where [A.S.] was—had—would go to counseling to determine just exactly what was going on. Obviously, he was extremely concerned about what was going on."

There was no contemporaneous objection to this testimony, and the issue is not properly raised on appeal. Absent a timely and specific objection, this issue is not one before us. See *State v. Yardley*, 267 Kan. 37, 38, 978 P.2d 886 (1999). While we need not consider matters raised for the first time on appeal, the evidence now objected to was relevant, admissible evidence.

### Evidence of adult sex toys

Dana contends the court erred in admitting evidence of the Adam and Eve invoice, including evidence of how Randy obtained a copy, had "Praise the Lord" written on it, and sent multiple copies to her family. Dana argues this evidence had no relevance but was highly prejudicial.

The evidence was relevant to demonstrate to the jury the relationship between Dana and Pastor Rollins. By showing the relationship between Dana and Pastor Rollins, the State impressed upon the jury how the restraining order preventing A.S. from associating with Pastor Rollins put Dana in a difficult position. Further, the evidence of Randy's sending the invoice to Dana's family showed the difficulty Randy was creating for Dana in her attempts to live as Pastor Rollins' wife. The evidence of Randy's intent to expose Pastor Rollins to Dana's family was relevant to Dana's motive to kill Randy.

### SRS's conclusion regarding Dana's credibility

Dana argues the trial court committed error when it admitted evidence that the sexual abuse allegations in 1989 and 1992 were unfounded. Further, Dana complains the evidence that SRS be-

lieved she coached A.S. to allege Randy had been molesting A.S. unfairly reflected upon her credibility.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Such evidence fit the State's theory that Dana killed Randy in order to have custody of A.S. The evidence was relevant, as it demonstrated how complicated Dana's position was becoming. The evidence was also relevant to demonstrate that Dana had used the legal system by making allegations of abuse. When this failed, Dana was left with few alternatives. Under these circumstances, we conclude that there was no abuse of discretion and that the probative value of the evidence was not outweighed by any unfair prejudice.

### Mikel's threat to Steve Flynn

Dana argues the trial court erred in admitting evidence of the December 7, 1992, incident at Steve's place of work when Mikel threatened Steve. The trial court properly admitted this evidence on the grounds that it was admissible both under K.S.A. 60-455 and as relevant evidence independent of K.S.A. 60-455. In admitting the evidence, the trial court gave the following cautionary instruction:

"Evidence may now be admitted concerning a crime or a civil wrong other than the present crimes charged. This evidence may be considered by you solely for the purpose of proving the defendant's intent or motive."

Dana argues the evidence of the confrontation was not admissible as evidence of motive. Dana mistakenly argues the confrontation "provided no motive for the murder of Randy Sheridan." The statute does not require that the evidence amount to a motive, but rather that the evidence is "relevant to prove some other material fact including motive." K.S.A. 60-455. Here, the evidence was relevant by analogy. The morning of December 7, 1992, Steve

informed Dana that he planned on interfering with Dana's custody of J.F. Hours later, Dana and Mikel arrived at Steve's place of work. A confrontation erupted, with Mikel having made the following threat: "I'm going to see you go down. I'm going to make you go down." Then Dana grabbed her brother's arm and added: "Now is not the time." While Dana contends her involvement in the incident was an innocent attempt to calm the situation, the evidence also demonstrates how she and her brother Mikel worked together to solve her problems.

Citing *State v. McCorgary,* 224 Kan. 677, 685, 585 P.2d 1024 (1978), Dana argues the evidence was not relevant to prove intent. The State argues the evidence of the confrontation was relevant to show the relationship between the parties. Further, the State argues the evidence of the confrontation was relevant based on the similarities of Steve's custody battle and Randy's custody battle.

Dana argues that the unfair, prejudicial effect of the evidence outweighed its probative value. She contends that it was wrong to hold her responsible for Mikel's unlawful act. However, this contention ignores the probative value of her own comment, "Now is not the time." Dana argues the evidence was unfairly prejudicial to the extent the evidence showed a "propensity" to rely on Mikel as her "heavy." Last, Dana argues the evidence of the confrontation distracted the jury from the weakness in the State's case.

The evidence was relevant. It demonstrated what Dana might do when frustrated in her attempts to gain custody of A.S. in a court proceeding. It also tended to show that Dana might resort to violence when legal efforts failed. The probative value of this evidence was not outweighed by its prejudicial effect. The trial court properly admitted this highly relevant evidence.

### Evidence of Steve's allegations against Dana

Dana argues the trial court erred when it admitted evidence of the allegations Steve made against Dana in his December 7, 1992, pro se motion, which precipitated the confrontation discussed above. The allegations included physical abuse, Dana's relationship with Pastor Rollins, Dana's allegations that Steve was a homosexual and the devil, Pastor Rollins' control over J.F., and Dana's failure

to get counseling. Dana's objection to the evidence regarding the allegations was overruled at trial.

We conclude the evidence regarding Steve's allegations was relevant. It demonstrated that Steve and Randy had similar difficulties with Dana and, in Steve's case, the difficulties culminated in a threat of violence. The reasonable inference for the jury was that Randy likewise faced a threat of violence.

### Judith Sheridan's opinion of Dana's and Mikel's guilt

Dana argues the trial court erred in admitting witness statements on the question of the defendants' guilt. As discussed above in the context of prosecutorial misconduct, Judith testified she believed Randy's being a good father was the reason he was killed: "It was— he was—he was an unusual father, and I'm sure that was probably the reason why he was killed." Neither Mikel nor Dana objected to this testimony, which precludes this court from considering the issue. See *Jamison,* 269 Kan. at 569-70. Then on Judith's recross-examination, the following colloquy occurred between Judith and Mikel's attorney:

"Q. You didn't want to protect Dana Flynn, because as you sit here today—look at me—you personally think Dana Flynn is a bitch, don't you?
"A. No, I think she's a murderer, too.
"Q. Okay. Couldn't wait to say that, could you? And you base that thought on all the facts that you've told us about—"

Judith's statement was in response to a question requiring her to say whether she believed Dana was a "bitch." The above question and answer were only a taste of the confrontational, acerbic tone Mikel's trial attorney chose in approaching carefully selected witnesses, of which Judith was one. Mikel's attorney failed to ask the court to admonish the jury to ignore the answer, but instead took the answer as a challenge and continued to badger Judith with questions culminating with the following: "And if it's the last thing you do, you're going to do your very, very best to fulfill Randy Sheridan's announced wish he's going to take the bitch down?"

Dana also complains on appeal of the statements of Randy's parents presented by Agent Brandau when the prosecutor asked

him to describe for the jury his December 22, 1992, interview of Dana:

"Q. Did you ask her any questions about whether or not she had been involved with Jerry Rollins in any way?
"A. Yes.
"Q. What did you ask her?
"A. If she was sexually involved with him.
"Q. And why did you ask that question?
"A. Because that was one of the allegations that was brought up to me by the Sheridans that—what they suspected to have been the cause of the death of their son."

Mikel's contemporaneous objection was then sustained.

With respect to Judith's statement, the State points out that Mikel's attorney also elicited such statements. During recross-examination by Mikel's attorney the previous day, the following occurred:

"Q. The fact of the matter is, ma'am, of your own knowledge you do not know who killed Randy Sheridan, do you?
"A. I know who did.
"Q. You do not know, do you?
"A. I know.
"Q. Who do you know? And I want to know how you know.
"A. Sometimes you just know things.
"Q. Okay. Thank you. You've answered all I need to hear from you. Sometimes you just know, that correct—is that correct? Sometimes a girl just knows?"

The State points out in its brief on appeal how the cross-examination reveals the defense strategy of showing how everyone involved in the case, whether family of the victim or law enforcement officers, jumped to conclusions by pinning the murder on Dana and Mikel. Thus, it was a defense strategy to elicit testimony from the State's witnesses on the matter of the ultimate question.

### Perjury evidence

Dana contends the trial court erred in admitting evidence that members of her and Mikel's family had testified at the inquisition and grand jury proceedings that the Fountain of Life Church doctrine did not include speaking in tongues or prophecy. Dana argues this evidence was irrelevant and prejudicial with respect to the

murder charges, and to this extent, Dana's argument is a repetition of her argument that the perjury charge and murder charges should not have been joined for trial. Our conclusion that the court did not abuse its discretion in joining the perjury and murder charges renders the admission of evidence on the perjury charge appropriate.

## 6. Violation of rights under Confrontation Clause

Dana argues the trial court violated her right to confrontation and committed reversible error by admitting hearsay evidence. The Sixth Amendment to the United States Constitution provides the criminal defendant with the right to be "confronted with the witnesses against him," and the Kansas Constitution gives the criminal defendant the right "to meet the witness face to face." Kan. Const. Bill of Rights, § 10. Although certain hearsay statements may be admissible as an exception to the hearsay rule, the Confrontation Clause may bar admission of such evidence. *Idaho v. Wright,* 497 U.S. 805, 814, 111 L. Ed. 2d 638, 110 S. Ct. 3139 (1990). The Court in *Idaho* described the hearsay analysis under the Confrontation Clause:

"In *Ohio v. Roberts*, we set forth 'a general approach' for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause. [Citation omitted.] We noted that the Confrontation Clause 'operates in two separate ways to restrict the range of admissible hearsay.' [Citation omitted.] 'First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case . . ., the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' [Citations omitted.] Second, once a witness is shown to be unavailable, 'his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' [Citations omitted.]" 497 U.S. at 814-15.

An appellate court reviews the trial court's decision to admit or exclude hearsay evidence under the abuse of discretion standard of review. *State v. Smith,* 271 Kan. 666, 670, 24 P.3d 727 (2001).

*Telephone conversation between Pastor Rollins and Kathlyn Garza*

Dana argues the trial court erred in admitting Pastor Rollins' statements during the January 1994 conversation with his daughter. The State called Kathlyn Garza, Pastor Rollins' daughter, who testified that she had a telephone conversation with her father in January 1994. Garza told her father Agent Brandau had come to talk to her, asking about speaking in tongues. The State asked Garza to describe Pastor Rollins' reaction to this information:

"Q. And when you told him what you had told Jeff Brandau about praying in tongues, did you father have a response to that?
"A. Yes. He said I really didn't know the answers to those questions, that it was more serious than I knew."

The State also asked Garza to testify whether Pastor Rollins was afraid of the implications of her testimony:

"Q. Did he mention any specific concerns to you about what would occur if you did testify?
"A. Yes. He said that I would be helping put him in prison."

Dana and Mikel objected to the admission of Pastor Rollins' statements to his daughter both before and contemporaneous with the admission of the evidence. Dana and Mikel were granted running objections. Later in the trial, the State played a tape of the January 31, 1994, conversation for the jury and provided the jury with a transcript of the conversation. Dana and Mikel objected.

The trial court reasoned Pastor Rollins' statements were admissible under K.S.A. 2001 Supp. 60-460(i)(2), which excepts from the general rule against those hearsay statements made against a party when "the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before it complete execution or other termination."

This court in *State v. Bird*, 238 Kan. 160, 175-76, 708 P.2d 947 (1985), held there are five prerequisites for application of 60-460(i)(2):

"This exception to the rule against admitting hearsay establishes five prerequisites to its application: (1) the person testifying must be a third party; (2) the out-of-court statement about which the person will testify must have been made by one of the coconspirators; (3) the statement of the coconspirator must have been outside the presence of the accused; (4) the statement of the coconspirator must have been made while the conspiracy was in progress; and (5) the statement must be relevant to the plan or its subject matter."

Dana argues that K.S.A. 2001 Supp. 60-460(i)(2) applies only to statements made by coconspirators while the conspiracy is in progress but does not apply once the conspiracy is complete. She argues that the conspiracy was complete when Flynn testified at the inquisition proceeding.

Dana cites *State v. Palmer,* 248 Kan. 681, 810 P.2d 734 (1991), and *State v. Cox,* 258 Kan. 557, 908 P.2d 603 (1995), for the propositions that a conspiracy is not an ongoing offense and that a conspiracy is complete when the object of the conspiracy is complete. *Palmer* discussed conspiracy in the context of determining whether concealment of a theft would toll the running of the statute of limitations and concluded the running would be tolled if the accused had concealed the fact of the crime.

"To constitute concealment of the fact of the crime of theft sufficient to toll the statute of limitations, there must be a positive act done by or on behalf of the accused calculated to prevent discovery of the thefts by those owning or having possession of the property before the theft. Mere silence, inaction, nondisclosure, or disposal of the stolen property is not concealment of the fact of the crime as contemplated in K.S.A. 21-3106." 248 Kan. at 690.

*Cox,* citing *Palmer,* held conspiracy to commit robbery "was completed at the time the robbery occurred." 258 Kan. at 580. In *State v. Johnson-Howell,* 255 Kan. 928, 937, 881 P.2d 1288 (1994), we rejected the application of 60-460(i)(2) because the particular statements were made after the crime had been committed. On the other hand, this court in *State v. Campbell,* 210 Kan. 265, 277-78, 500 P.2d 21 (1972), discussed the application of 60-460(i)(2) in the case of a conspiracy. *Campbell* held in its analysis of *State v. Borserine,* 184 Kan. 405, 337 P.2d 697 (1959):

"K.S.A. 60-460(i) codifies in substance the exception to the hearsay rule as stated in *Borserine.* In *Borserine* this court accepted the view that a conspiracy is not terminated when an attempt to conceal the offense is made. The acts and

declarations of one conspirator in the prosecution of the crime or its concealment in the foregoing respects are considered the acts and declarations of all, and are evidence against all. (Syl. 5.)" 210 Kan. at 277.

Pastor Rollins attempted to conceal the conspiracy. Circumstantial evidence is sufficient to establish the fact that the conspiracy was ongoing at the time of the declarant's statement. See *Bird,* 238 Kan. at 176-77.

There was ample circumstantial evidence in this case to establish that the purpose of Pastor Rollins' conversation with his daughter was to conceal the conspiracy. See *Bird,* 238 Kan. at 176-77. Thus, we conclude that the trial court did not abuse its discretion in admitting the evidence pursuant to K.S.A. 2001 Supp. 60-460(i)(2).

### *J.F.'s references to evil and the devil*

Dana argues the admission of J.F.'s statements violates both the hearsay evidence rules and the Confrontation Clause. Dana cites no authority in this analysis. The State argues that the evidence was not offered for the truth of the matter but rather demonstrated how Dana was poisoning J.F.'s mind, thereby providing, in part, grounds for the underlying custody dispute.

The general prohibition against hearsay excludes "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." K.S.A. 2001 Supp. 60-460. Dana concedes in her brief on appeal that the statements of J.F. referring to the devil were not admitted to show Steve was the devil, but rather were admitted to prove that Dana or Pastor Rollins told J.F. that Steve was the devil. As Dana acknowledges in her brief on appeal, the State offered the statements to explain how Dana and Mikel could have been motivated to kill Randy. The prosecutor argued the following to the trial court on this matter:

"At the same time there were teachings to these children in the church by Jerry that Steve Flynn was evil. There will be testimony that the source of this—faggot, that he was a faggot, that—there were prophecies by Dana that Randy was evil, that there were prophecies by Jerry that Randy was evil. That is why he was killed. And what this three-year-old child does is he confirms that these things were taking place.

"And there's nothing about the text of what he says that is offered for the truth of the matter asserted, and hearsay is a technical objection. These things are offered to prove that the statements were made. We're not offering them to prove that Randy is evil, we're not offering them to prove that he's the devil, we're not offering them to prove that Steve is a faggot, and those are what the statements are. These statements are offered to prove that they were made. They are not hearsay."

This court has held on other occasions that statements not admissible for the truth of the matter stated do not run afoul of the prohibition against hearsay. See *State v. Smith*, 271 Kan. at 673; *State v. Vontress*, 266 Kan. 248, 253, 970 P.2d 42 (1998); *State v. Ninci*, 262 Kan. 21, 52, 936 P.2d 1364 (1997); *State v. Getz*, 250 Kan. 560, 567, 830 P.2d 5 (1992). Thus, unless the State could have gained probative value from branding Steve Flynn as a devil, there cannot be a hearsay problem with J.F.'s statements. Dana was given ample opportunity to cross-examine Steve regarding whether he actually heard the statements. Further, Dana had the opportunity to present evidence tending to show J.F. had learned to believe his father was a devil from a source other than herself or Pastor Rollins.

Some of the statements, however, were presented for the truth of the matter:

"Q. [Prosecutor:] And on the 6th of June, did [J.F.] make a statement to you that you made note of?
"A. [Steve Flynn:] Yes, he did.
"Q. What did he say concerning you?
"A. Said, '*We went to Pastor Rollins' house and didn't come back.*'
. . . .
"Q. And did he make any statements that you made note of on the 13th or that caused you concern?
. . . .
"A. He *said he had a new daddy and that that daddy was Jerry Rollins.*" (Emphasis added.)

While there were no contemporaneous objections to hearsay, the trial court granted both Dana and Mikel standing objections to the admission of J.F.'s statements.

During therapist Fechter's testimony regarding her time with J.F., she testified as follows:

"Q. [Prosecutor:] And when you asked him about the church, did he make denials about going to church?

"A. He just said that there was no such place, you know, there was no such a building, there was no church.

"He also—I—I—I don't know if I said this, but one other thing he did say to me was, when I did ask him, you know, how he knew that his dad was the devil, *and he said to me that his mother had told him that*." (Emphasis added.)

Again, there was no contemporaneous objection; however, both Dana and Mikel were granted a running hearsay objection to J.F.'s statements earlier during Fechter's examination.

The emphasized language in the quotations above represents J.F.'s statements which must have been offered for the truth of the matter: whether Dana indeed said those things. The difference between the above two quotations and the "devil statements" is that the above quotations stated matters tending to support claims that the State wished the jury to take as the truth. *State v. Harris*, 259 Kan. 689, 915 P.2d 758 (1996), likewise rejected the State's assertion that the general hearsay rule did not apply. Harris, while serving time in a correctional facility, was convicted of first-degree murder and aggravated battery of a law enforcement officer following an incident in the correctional facility recreational area. During trial, the State offered evidence that a member of Harris' gang, the Vice Lords, stated that the gang harbored ill will toward the correctional facility guards and intended to seek revenge. The State argued for the admissibility of the statements by saying they were not for the truth of the matter stated. On appeal, the court rejected this argument, finding the statements were presented as evidence of premeditation. Importantly, the court found that the truth of the matter stated was actually crucial to the State's desire to admit the statements: "However, the only way in which the evidence can be used to infer premeditation on the part of the defendant is if the statements asserted were true, *i.e.*, if the guards were actually cracking down on the Vice Lords and the Vice Lords felt that they should get even." 259 Kan. at 698-99.

However, the *Harris* analysis did not end there but rather continued by considering whether the error was harmless. The court held that the admission or exclusion of evidence is subject to the .

harmless error rule. *Harris* held the error harmless because the statement merely bolstered the State's "ample" evidence that the gang was angry with the correctional facility guards. 259 Kan. at 700.

The admission of J.F.'s hearsay statements was likewise harmless. There was ample evidence in this case that Dana was spending nights at Pastor Rollins' house. For example, Ann Kohman, Pastor Rollins' next door neighbor, testified she first saw Dana in the spring of 1992 and that she believed Dana was living at Pastor Rollins' house. While it was error to admit J.F.'s statements which were presented for the truth of the matter stated, we conclude those admissions were harmless beyond a reasonable doubt; they did not affect the substantial rights of the parties. See 259 Kan. at 700.

## 7. Cumulative error

Dana argues cumulative trial error amounts to reversible error in this case. We have concluded that most of the alleged errors were not errors. None found to exist required reversal. Thus, we conclude that the defendant's claim of cumulative error fails.

## 8. Motion for new trial

Dana argues the trial court erred in failing to grant her motion for a new trial based on newly discovered evidence. The standard of review of a district court's denial of a motion for new trial based on newly discovered evidence is abuse of discretion. *State v. Henry,* 263 Kan. 118, 132, 947 P.2d 1020 (1997). If a reasonable person could agree with the trial court's decision, it will be upheld on appeal. 263 Kan. at 132.

*Henry* described the applicable rule for deciding whether to grant a new trial based on newly discovered evidence:

"In deciding whether a new trial is warranted, the defendant bears the burden of proving that the evidence is in fact 'new' and could not have been produced at trial with reasonable diligence, and this evidence must be of such materiality that a reasonable probability exists that it would result in a different outcome at trial. [Citations omitted.]" 263 Kan. at 132-33.

Dana and Mikel called four witnesses during the hearing. One of the witnesses to testify was Mikel's trial counsel, D. Lee Mc-Master. McMaster testified his secretary told him the day of the verdict in this case, November 26, 1996, that Jackie Perry from Salina had called his office claiming to have information regarding Randy's murder. McMaster called Perry and agreed to meet him at a truck stop in Salina. McMaster described Perry's story to the court.

Jackie "Jack" Perry testified at the hearing on the motion for new trial. Perry called McMaster's office after he had read about Dana's and Mikel's convictions. McMaster, who was conducting the direct examination of Perry, peremptorily asked Perry to describe his one prior felony for terroristic threat, and multiple misdemeanors, including disorderly conduct, battery, theft, and driving while under the influence.

Perry testified he knew John Judd. Judd worked for Perry at Perry's place of business, Blackjack Motors. Perry testified he and Judd were at a bar in Salina drinking. Perry estimated the date of the incident was 1 and ½ years prior to the November 27, 1996, hearing. Perry described the conversation:

"And, you know, out of the blue he goes, you know, 'Did you hear about that murder over in Junction City?' And, you know, I stopped for a minute, and I go, 'Which murder are you talking about?' I didn't know at the time what he was referring to. Then he goes—he goes, 'That murder that they call the jogger murder.' And I said, 'Well, yeah, I heard about that.' I think I told him I'd read something about it in the newspaper, so I had seen something about it.

"And he goes, 'Yeah,' he says, 'me and my brother are the ones that took the contract out on that.' And I kind of stopped, and I asked him, I said, 'What do you mean you're the one that took the contract?' And he said, 'Well,' he says, 'me and my brother was hired to kill that guy.' And I said, 'You mean the guy in Junction City?' And he said, 'Yeah,' and then he proceeded to tell me how he did it."

According to Perry, Judd seemed "pretty serious" and "dead serious" about the matter. Perry became nervous because of what Judd had said and offered to give Judd a ride home. On the way to Judd's place, Judd became upset when Perry indicated he did not want to hear anything about the matter. Perry described what happened next:

"And that's when, you know, he kind of got a little bit quieter, and he looked at me and he said, you know, 'The same thing can happen to you,' and about that point in time, I said, 'You get the hell out of my car or there is going to be a problem right here right now.' And, finally, he did get out of my car, and I left."

Ultimately, Perry parted ways with Judd, citing Judd's violence and use of drugs.

Mikel and Dana also presented the testimony of Laura Lee Sonneberger and Gregory J. Sonneberger. Laura testified she knew John Judd from working at the Red Lobster and had an affair with him while she was married to her husband, Gregory. When asked to tell the court what John Judd had said to her, Laura said,

"He asked me if he thought that—that—if I thought that he was capable of committing murder, and I asked him what did he mean by that, and his answer was that he indeed had committed a murder in Junction City, if I had remembered a jogger, and I said, yes, I remember, and he said that him and his brother, Sheldon, had done that."

Toward the end of the relationship, Judd and Laura had a falling out, which culminated in assault and battery charges against Judd. Gregory testified and confirmed that his wife told him that Judd claimed to have murdered someone and that "it would be easy for him to do it to [the Sonnebergers]."

Laura testified John Judd received favoritism from the Salina police department. Jack Perry testified regarding a telephone conversation he overheard between Judd and someone at the Salina police department. According to Perry, Judd was accused of battery by a former girlfriend. Judd called someone at the police department, explained his story, hung up, and then said to Perry, "Well, that's taken care of. They'll take care of that for me."

The State called Larry Thomas, a special agent with the KBI, at the hearing. Agent Thomas had interviewed Jack Perry. Agent Thomas described one of Perry's statements: "During the course of going through [Perry's] statement, [Perry] indicated that [Judd] brags a lot, make up things." Agent Thomas testified he arranged for Perry to make contact with John Judd while wearing a wire. While the agents were listening and taping the conversation, Perry did not broach the subject of Randy's murder. Agent Thomas testified Perry explained he did not ask Judd about Randy's murder

because he was nervous about making Judd suspicious. Agent Thomas investigated Saline County records and discovered Judd was in jail on December 22, 1992.

Brian Shea, a captain with the Saline County sheriff's department, testified and confirmed John Judd was locked in the Saline County jail from March 6, 1992, until January 6, 1993. Shea testified inmates in the jail are not allowed to leave.

Agent Thomas testified about his interview of John Judd. Judd said he may have "bragged about, quote, 'kicking someone's ass,' unquote, but that was it." Agent Thomas testified on cross-examination that his investigation revealed Sheldon Judd, John's brother, was in a welding class on December 22, 1992, until 1 or 1:30 p.m.

Sheldon Judd testified he was currently in prison, having been convicted of murder, robbery, burglary, and a conspiracy charge. Sheldon Judd denied having killed Randy and denied the existence of a professional contract for Randy's murder. John Judd testified he was in jail during December 1992. While John Judd admitted he considered himself to be a braggart, he denied having made any statements about having killed Randy. On cross-examination, John Judd testified he believed his brother was a violent person and was capable of murder.

The trial court heard the motion for new trial. The court observed the witnesses and weighed the credibility of the evidence presented. Nothing was offered of such materiality, reliability, or credibility that there was a reasonable probability that a different outcome would result from a new trial with the addition of the proffered evidence. Dana failed to establish that the trial court abused its discretion in denying her a new trial.

Affirmed.

DAVIS, J., not participating.

JONES, S.J., assigned.