(108 P.3d 448)
No. 91,107

STATE OF KANSAS, *Appellee*, v. WENDY DUMARS, *Appellant*.

Opinion filed March 25, 2005.

*Paige A. Nichols*, of Lawrence, for appellant.

*Bobby J. Hiebert, Jr.*, assistant county attorney, *Ellen Mitchell*, county attorney, and *Phill Kline*, attorney general, for appellee.

Before HILL, P.J., MALONE and GREENE, JJ.

GREENE, J.: Wendy DuMars appeals her convictions of one count of attempted manufacture of methamphetamine, two counts of possession of drug paraphernalia for manufacturing purposes, and one count of child endangerment, arguing uneven application of the hearsay rule, prosecutorial misconduct, instruction errors, cumulative trial errors and insufficiency of evidence to support her convictions. We conclude that (i) one count of child endangerment is reversed; (ii) cumulative trial errors warrant reversal of the manufacturing-related convictions and a new trial; and (iii) appeals of remaining convictions are deemed abandoned.

*Factual and Procedural Overview*

During a search of the trash outside 1117 Franklin in Salina, officers found 45 empty blister packs of Sudafed, 3 syringes with residue that tested positive for methamphetamine, and lithium batteries with the lithium strips removed. After obtaining a warrant, officers entered the residence and found "Duff" Sullivan, Holly Metro, Heather Metro, Wendy DuMars (who was under the influence of methamphetamine), and three unattended children, one of whom was Holly's 1-year-old, and two of whom were Dumars' twin daughters. A search of DuMars' person revealed a switchblade knife and a film canister containing rocks and powder of methamphetamine. A search of the residence, backyard shed, and a car belonging to Sullivan revealed a host of items generally used in the manufacturing of methamphetamine, some of which bore residue that tested positive for methamphetamine. A search of DuMars' car revealed a can of Heet, a brand of gas line antifreeze.

DuMars ultimately admitted that she used methamphetamine on the morning of the search and that Sullivan was the source. From the outset, however, she told authorities that she and Sullivan had an agreement that he would not bring any methamphetamine manufacturing supplies into the house occupied by Heather Metro, Sullivan, and herself. At trial, DuMars testified that Sullivan had moved the methamphetamine lab supplies into the house and shed on the morning of the search without her knowledge or consent. Other witnesses testified that they had toured the house shortly before the day of the search and did not see anything to indicate methamphetamine manufacturing activity.

The jury convicted DuMars of one count of attempted manufacture of methamphetamine, two counts of possession of drug paraphernalia for manufacturing purposes, possession of methamphetamine, possession of marijuana, three counts of child endangerment, obstruction of official duty, and criminal use of a weapon. She now appeals the convictions for one count of attempted manufacture of methamphetamine, two counts of possession of drug paraphernalia for manufacturing purposes, and one count of child endangerment (that related to Holly Metro's child).

*Did the District Court Err by an Uneven Application of the Hearsay Rule?*

DuMars argues that she was denied due process by the district court's admission of certain inculpatory hearsay evidence and the exclusion of her exculpatory hearsay evidence, citing *State v. Brickhouse*, 20 Kan. App. 2d 495, 500-03, 890 P.2d 353, *rev. denied* 257 Kan. 1093 (1995).

"The admission of an incriminating hearsay statement, coupled with the refusal to admit an exculpatory hearsay statement by the same declarant, is so fundamentally unfair as to be an abuse of discretion and a denial of due process. . . .

". . . Application of the hearsay rule in this manner offends our sense of justice and fair play and affects the jury process in an unacceptable manner. The question of whether the exculpatory statement is reliable is overridden by the inherent unfairness that will occur if that statement is excluded while a similar hearsay statement that is incriminating is admitted." 20 Kan. App. 2d at 503.

She cites five examples of the State's inculpatory hearsay, two of which received no objection, two of which were admitted after late objections, and one of which was stricken after a late objection. She was not permitted to elicit three instances of exculpatory testimony when the district court sustained the State's hearsay objection on each occasion. We review each instance of such testimony in determining whether the district court abused its discretion.

### Inculpatory Instance No. 1

During direct examination by the prosecutor, one of the officers who executed the search warrant at the residence was asked:

"Q. . . . [E]xplain to the jury how you went about obtaining a search warrant for that address.

"A. I had been receiving information referencing that address and the subjects inside of it, involving manufacturing methamphetamine."

There was no objection or motion to strike this testimony.

### Inculpatory Instance No. 2

During cross-examination of the same officer, the following exchange occurred:

"Q. You have no personal knowledge that Wendy DuMars ever supplied Duff Sullivan with any ingredients or assisting him in manufacturing methamphetamine, do you?

"A. Yes, I do.

"Q. You do? What—what did you observe?

"A. You asked personal knowledge.

"Q. I was asking you for your personal knowledge, things that you saw or—

"A. Through my interviews.

"Q. —your own eyes.

"A. Through my interviews conducted, I obtained information that she was assisting him."

After objection of the defense, this testimony was stricken, but the jury was not admonished to disregard it.

### Inculpatory Instance No. 3

During direct examination of another officer who executed the warrant, the prosecutor asked:

"Q. . . . And, how did you get involved in that particular incident?

"A. The drug task force had been receiving information in reference to Duff Sullivan and Wendy DuMars at this particular address."

There was no objection or motion to strike this testimony.

### Inculpatory Instance No. 4

During redirect examination of yet another officer involved in executing the warrant at the residence, and after testimony on direct regarding contraband found in Sullivan's jeep, the prosecutor asked:

"Q. . . . [W]as it reported to you that Ms. DuMars was operating Mr. Sullivan's jeep on an occasion?

"A. Yes.

"Q. Now—

"MR. HARTNETT: Well, Your Honor, got to object to the—

"THE COURT: Counsel, if you'd objected, I'd have sustained it. You didn't. Jury's heard it. There it is. Go ahead."

### Inculpatory Instance No. 5

During rebuttal the State recalled one of the officers for the purpose of relating an interview with Heather Metro. The following exchange occurred near the end of a trial day:

"Q. . . . Did she tell you about an incident when Mr. Sullivan and Ms. DuMars came home and they were mad at each other?

"A. Yes, she did.

"Q. What did she tell you?

"A. She stated that on one particular day, at the beginning of December, Duff had come home with Wendy late at night, and Duff was mad at Wendy. Duff ended up explaining the situation, why he was mad, and he stated that Wendy had almost killed the both of them. He advised that there was anhydrous ammonia that they were hauling back in the back of their vehicle, and Wendy was diving crazy, causing the anhydrous ammonia to spill everywhere."

Although defense counsel did not immediately object or move to strike the testimony, the following day counsel moved to strike this testimony as containing double hearsay. The court denied the motion on grounds that "[t]he case is closed. We've got the evidence in." Counsel then asked for a mistrial, which was denied. During its deliberations, the jury asked for a readback of this testimony, and the readback was granted over the objection of the defense.

### Exculpatory Instance No. 1

On cross-examination of the officer involved in inculpatory instance No. 1, defense counsel attempted to elicit more specific "information" that the warrant may have been based upon, believing it could be established that it was Sullivan rather than DuMars who had been implicated by an informant. The State objected to this line of questioning, stating:

"I mean, I realize we, on direct examination, we got into the anonymous tip, but we didn't get into the information, because it's not admissible. And, the question assumes facts that are not in evidence."

The court sustained the State's objection.

### Exculpatory Instance No. 2

In order to distance DuMars from the manufacturing activity, the defense called Heather Metro for the purpose of establishing that Sullivan apparently took sole credit for the manufacturing. This exchange occurred:

"Q. Did he ever talk about making methamphetamine?

"MR. ROE. Objection. It's going to call for a hearsay answer.

"THE COURT: Sustained."

### Exculpatory Instance No. 3

On two occasions, during the testimony of DuMars' father and Heather Metro, the court sustained the State's objections to testimony regarding DuMars' statements to these witnesses on the grounds of hearsay, even though defense counsel guaranteed that DuMars would take the stand. The judge explained: "I'm going to sustain the objection. Maybe you can change the order of your proof, but I'll sustain that objection as to comments made by the defendant until, and if, she decides to take the stand, okay?"

On appeal, DuMars relies principally on this court's decision in *Brickhouse*, where the court reasoned:

"[H]ere, the hearsay rule was applied to deprive defendant of evidence vital to his theory of defense, while at the same time that rule was manipulated to admit into evidence a hearsay statement of the same declarant incriminating defendant. We suggest that such an application of the hearsay rule is unfair and deprived defendant of the right to present his theory of defense to the jury. Whatever name one may wish to use, the admission of an incriminating hearsay statement, coupled with the refusal to admit an exculpatory hearsay statement by the same declarant, is so fundamentally unfair as to be an abuse of discretion and a denial of due process under the facts presented.

"We hold that if an incriminating hearsay statement is admitted in an effort to convict a defendant, an exculpatory hearsay statement by the same declarant which tends to exonerate that defendant or which supports the theory of defense may not be denied admission into evidence on the grounds that it is unreliable. Application of the hearsay rule in this manner offends our sense of justice and fair play and affects the jury process in an unacceptable manner. The question of whether the exculpatory statement is reliable is overridden by the inherent unfairness that will occur if that statement is excluded while a similar hearsay statement that is incriminating is admitted." 20 Kan. App. 2d at 503.

Here, the State argues that the *Brickhouse* holding is not applicable because the defense failed to object to two of the inculpatory hearsay statements and objected in an untimely manner to two others. We agree that this presents a distinction from *Brickhouse*. Ordinarily, the failure to object to inadmissible evidence at trial precludes raising the issue on appeal. *State v. Wilson*, 247 Kan. 87, 98, 795 P.2d 336 (1990). The rule is based upon K.S.A. 60-404 which provides that a verdict shall not be set aside "by reason of

the erroneous admission of evidence unless there appeals of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." Our Supreme Court has acknowledged, however, that appellate courts have the power to consider such an issue "in exceptional circumstances . . . where consideration of the . . . issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights." *State v. Clemons*, 251 Kan. 473, 483, 836 P.2d 1147 (1992).

As to the two occasions here where no objection was interposed to the inculpatory hearsay testimony, the parallel strict application of the hearsay rule to exclude the exculpatory testimony creates an exceptional circumstance where we must consider the issue to prevent a denial of fundamental rights. Here K.S.A. 60-404 has no application because it is not solely the "erroneous admission of evidence" that is challenged, it is the admission of evidence *coupled with the exclusion of parallel exculpatory evidence* that is challenged by the defendant. Moreover, following the admission of such inculpatory evidence, the trial court has an opportunity to exercise its discretion in determining whether objection to the parallel exculpatory evidence should be sustained. Here, on at least one occasion, the State acknowledged that there was some nexus between the inculpatory and exculpatory instances, and the court had an opportunity to rectify the problem by permitting the exculpatory testimony. For these reasons, in determining whether the rule of *Brickhouse* may be applicable on appeal, it is not essential to our review that timely objection be made to the inculpatory statements.

As to the two occasions where an objection was made after answers were elicited but the court refused to strike the testimony, the State argues that the lack of a *contemporaneous* objection bars any claim of error. We disagree. Our Supreme Court has shown consistent willingness to consider timely an objection to inadmissible testimony where the objection is made in sufficient time for the court to rectify the problem. See, *e.g.*, *State v. Parson*, 226 Kan. 491, 493, 601 P.2d 680 (1979); *State v. Gordon*, 219 Kan. 643, 651-52, 549 P.2d 886 (1976) (superseded by statute as noted in *State v. Murry*, 271 Kan. 223, 225, 21 P.3d 528 [2001]). Here,

there is no question that the objections were made in sufficient time for the court to strike the offending testimony and instruct the jury.

The State also argues that some of the purported inculpatory hearsay testimony was merely foundational, consisting of the mere basis for investigation. Our Supreme Court first addressed this issue in *State v. Thompson*, 221 Kan. 176, 178-79, 558 P.2d 93 (1976), quoting with approval from New Jersey authority:

> " ' . . . This [hearsay] rule is not violated when "a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so 'upon information received.' " [Citation omitted.] Such evidence is not admitted to establish the truth of the information received by the officer but rather to explain the reason for his approaching the scene and his subsequent conduct. [Citation omitted.]
>
> "*Where, however, the information as related to the jury directly or by necessary inference points to the guilt of the defendant, the testimony is inadmissible.* [Citations omitted.]" (Emphasis added.)

See *Moore v. United States*, 429 U.S. 20, 50 L. Ed. 2d 25, 97 S. Ct. 29 (1976); *State v. Jamison*, 269 Kan. 564, 570, 7 P.3d 1204 (2000); .

Here inculpatory instances No. 1, No. 2, and No. 3 were not merely foundational because in each instance the officer went beyond stating that the basis was "information received" to state that it was information *that the defendant was involved in illegal activity*. This testimony violated the rules endorsed by the Supreme Court in *Thompson* and was not mere foundation. We also note that such testimony citing specific information that the defendant was involved in some prior crime may also violate K.S.A. 60-455.

Applying these rules, we conclude that the district court abused its discretion (i) in sustaining the State's objection to exculpatory instance No. 1 (*Brickhouse* violation), (ii) in refusing to sustain somewhat belated defense objections to inculpatory instances Nos. 4 and 5, and (iii) in failing to strike and instruct the jury on the prejudicial hearsay elicited in both instances. We conclude that there was no abuse of discretion in the district court's actions in handling exculpatory instances Nos. 2 and 3, respectively, because *Brickhouse* does not apply absent unity of the declarant in the

parallel testimony and because we are unable to conclude that there was abuse of discretion in the court's requirement for the defense to sequence first the defendant's own testimony as a condition to admission of out-of-court statements of the defendant related by third parties. We need not address whether these errors were harmless because of our later analysis as to cumulative error.

*Did Prosecutorial Misconduct Render DuMars' Trial Fundamentally Unfair?*

DuMars next argues that her trial was infected by several instances of prosecutorial misconduct. She alleges such misconduct in the prosecutor's (i) repeated elicitation of inadmissible hearsay testimony; (ii) *Doyle* violation; (iii) persistent misstatement of facts; and (iv) undermining the instructions to the jury.

When prosecutorial misconduct is alleged on appeal, appellate courts must consider three factors to determine whether a new trial should be granted: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. See *State v. Tosh*, 278 Kan. 83, 93, 91 P.3d 1204 (2004).

Prosecutorial misconduct to which there was no objection at trial may nonetheless be reviewed on appeal where the prosecutor's misconduct is so prejudicial or constitutes a constitutional violation which, if not corrected, will result in injustice or a miscarriage of justice. *State v. Puckett*, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982). If a claimed error implicates a defendant's right to a fair trial, the appellate standard of review is the same regardless of whether the issue of prosecutorial misconduct is preserved by an objection at trial. *State v. Doyle*, 272 Kan. 1157, 1164, 38 P.3d 650 (2002).

## Elicitation of Inadmissible Hearsay Evidence

DuMars alleges prosecutorial misconduct in the elicitation of the inculpatory hearsay testimony that we have analyzed above. We conclude that instances Nos. 1 and 3 do not reflect prosecutorial

misconduct because the questions that were posed did not necessarily seek the hearsay that was volunteered by the witnesses. Absent some indication that there was prosecutorial complicity in the answers volunteered by the witnesses, we cannot ascribe misconduct to these instances.

As to instance No. 4, the question posed by the prosecutor was not only designed to elicit hearsay, it contained and suggested hearsay by asking, "[W]as it reported to you that Ms. DuMars was operating Mr. Sullivan's [contraband-laden] Jeep on occasion?" The State does not defend this questioning but rather argues that there was no objection and no clear prejudice. As noted above, we reject the lack of objection as a defense under these circumstances, and we will address the prejudice issue in our determination of cumulative error.

As to instance No. 5, the questioning by the prosecutor contained and suggested hearsay by asking, "[D]id [Heather] tell you about an incident when Mr. Sullivan and Ms. DuMars came home and they were mad at each other?" followed by, "What did she tell you?" The State again notes that there was no objection and argues that the questioning was proper given the thrust of questions on direct which "opened the door for such an attack." We disagree.

Our Supreme Court has recognized that the elicitation of inadmissible testimony may constitute prosecutorial misconduct. *State v. Kunellis*, 276 Kan. 461, 477-79, 78 P.3d 776 (2003); *State v. Flynn*, 274 Kan. 473, 491, 55 P.3d 324 (2002); *State v. Henry*, 273 Kan. 608, 641, 44 P.3d 466 (2002); *State v. Donesay*, 265 Kan. 60, 89, 959 P.2d 862 (1998). In fact, our Supreme Court recently recognized that elicitation of inadmissible testimony can be "the most egregious and inflammatory example" of such misconduct. *Tosh*, 278 Kan. at 94. The State's conduct in eliciting hearsay in both of these instances undoubtedly constitutes gross and flagrant misconduct. Although the dissent takes special exception to this conclusion, we believe that the deliberate framing of a question to include a suggested hearsay response that is clearly inadmissible and prejudicial can be neither the result of prosecutorial innocence nor inexperience. Whether there was any ill will and the ultimate im-

pact of any misconduct on the jury are issues we reserve until our cumulative error analysis.

## *Doyle* Violation

DuMars next claims that the State engaged in misconduct by eliciting testimony which commented on her termination of her post-arrest interrogation, claiming that these references were impermissible statements on her post-*Miranda* silence, contrary to *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976).

"A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent [citation omitted]." *State v. Edwards,* 264 Kan. 177, 195, 955 P.2d 1276 (1998).

DuMars takes issue with the following trial testimony of an officer involved in her post-*Miranda* interview:

"Q: Okay. And, what was the first thing you asked her during the course of the interview?

"A: I asked Wendy to tell me what was going on.

"Q: And, what did she tell you?

"A: She became extremely upset and stated that she used dope, was the term that she used, and that I had no right to judge her.

"Q: Okay. Anything else?

"A: She began to yell at me and tell me that she wanted to know where her children were at.

"Q: Did you tell her?

"A: I did, because I could not get her off that particular focus that she was on. I told her that her kids were most likely going to be placed into SRS custody.

"Q: All right. What else did she have to say?

"A: She stated that I had no right. She let me know that if she chose to do dope, then she would.

"Q: Okay. And, did that terminate your discussion with her?

"A: Well, she, again, began to yell at me and explain to me that I had no right to judge her *and stated that she would not answer any more of my questions at that time.*.

"Q: So, you just — what did you do?

"A: I terminated the interview and placed her back into a holding cell." (Emphasis added.)

There is no question that this was a *Doyle* violation. See *Edwards*, 264 Kan. at 196. Contrary to the State's argument, it does not matter that DuMars initially waived her rights; eliciting testimony on a defendant's post-*Miranda* silence is impermissible. We respectfully disagree with the dissent, which claims that the violation was "based upon a witness' nonresponsive answer to the prosecutor's question." The question, "[D]id that terminate your discussion with her?" was itself unnecessary; although it may have been capable of a mere "yes" response, it appears not likely calculated to provoke precisely the explanation given, that the defendant invoked her *Miranda* rights. Absent such motivation, we fail to perceive any need for the question. DuMars cites the language from *Miranda* that the advisory of rights was "devised to inform accused persons of their right of silence *and to ensure a continuous opportunity to exercise it.*" (Emphasis added.) *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). We agree. Accordingly, we conclude that the prosecutor violated *Doyle*. Again, we reserve our examination whether the error was harmless until we review cumulative error.

## Undermining Instructions to the Jury

DuMars challenges the prosecutor's comments during closing argument regarding the unanimity instruction. These comments included the following:

"Being lawyers, we always have this tendency to make things real complicated if we can. And, so, part of what I want to do here, for the first part of the, my discussion, is see if we can't simplify this down a little bit.

"If you would look at your Instruction No. 3A, you will see that it says something about you got to unanimously decide—if you decide that the defendant's guilty of possession of ephedrine, got to unanimously decide on one item.

. . . .

"So, although the instruction is pretty complicated, when you get right down to it, the putting the instruction into effect is probably not that difficult. It's just a matter of, you got to kind of think about that when you're doing it. It's something that the Court of Appeals in Kansas has come up with here lately, and the Judge, of course, here, is obligated to, to follow their instruction. Okay.

"Let's get down to the stuff that everybody kind of understands here, I think, including myself."

We conclude that the tenor of such comments, especially the suggestion that our court recently dreamed up the requirement of unanimity (despite its roots in the constitutional right to a jury trial) potentially had the effect of causing the jury to disregard the instruction as unduly complicated, unwarranted, and of no real consequence to its determinations. We agree with DuMars that such comments render suspect the verdicts on all charges relying on multiple acts. Whether this was harmless will be addressed in our consideration of cumulative error.

## Misstatements of Fact

DuMars next argues that the State misstated material facts in its closing argument to the jury. The fundamental rule for closing arguments is that the prosecutor must confine his or her remarks to matters in evidence. It is clearly improper for the prosecutor to state facts that are not in evidence. *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200 (2004).

First DuMars alleges that the State misstated the evidence by suggesting four times in closing argument that a videotape of the officers' search of vehicles, residence, and the shed shows that "none" of the contraband was hidden. The videotape shows officers pointing out drug paraphernalia and evidence of methamphetamine manufacturing found during the search, but the State's assertions that "none" of the contraband was hidden is not supported by the videotape itself, which shows officers opening fanny packs, backpacks, boxes, and coolers to reveal the incriminating contents. Although some of the contraband was shown to be found in plain view, the State's comments appear to have mischaracterized the evidence beyond the latitude permitted. See *Ly*, 277 Kan. at 393. The dissent has characterized these misstatements as "trivial," especially in light of the fact that the jury was allowed to see a videotape of the entire search. Our review of authorities discussing prosecutorial misstatements does not suggest a rule that harm is minimized by the jury's ability to hear or observe the evidence firsthand. In fact, if this were considered as an exception or an excuse to such misconduct, the exception would swallow the rule. In every case of such misconduct, the court contrasts the evidence

as presented with any misstatements *regarding that same evidence.* See, *e.g., Ly,* 277 Kan at 393. With respect for the dissent, we simply believe that the prosecutor is given wide latitude in the language and manner of presentation of closing argument, but he or she must assure that the argument is consistent with the evidence presented. *State v. McCorkendale,* 267 Kan. 263, 278-79, 979 P.2d 1239 (1999).

DuMars also claims that the State misstated her testimony in asserting that she had denied sleeping with Sullivan, in contrast to her earlier admission to the contrary. The State argues that this was proper in order to challenge DuMars' veracity. In fact, her testimony was consistent both in her earlier interview statement and in her testimony at trial that she had indeed on occasion slept with Sullivan. The State improperly misstated her testimony.

Finally DuMars claims that the State misstated that she had endangered Heather Metro's 2-year-old child. In fact, the charge was that she had endangered Holly Metro's 1-year-old child. We are not impressed with this argument and are inclined to conclude that this misstatement may have reflected an inaccurate recollection of facts and was inconsequential to the overall fairness of DuMars' trial.

We concede that the degree of harm of these misstatements may differ, but we reserve our analysis of harm to our discussion of cumulative error.

*Did the District Court Err in Failing to Give a Nonexclusive Possession Instruction?*

DuMars next claims that even though she did not request it, the trial court should have given an instruction on nonexclusive possession for the charges of attempted manufacture of methamphetamine and possession of drug paraphernalia for manufacturing purposes.

" 'It is well established that [an appellate] court reviews a trial court's failure to give an instruction by a clearly erroneous standard where the party neither requested the instruction nor objected to its omission.' [Citation omitted.]" *State v. Pabst,* 273 Kan. 658, 660, 44 P.3d 1230, *cert. denied* 537 U.S. 959 (2002). "Instructions are

clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. [Citations omitted.]" *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003).

The instruction DuMars argues the court erroneously failed to give is the nonexclusive possession portion of PIK Crim. 3d 67.13-D, which reads:

"When a defendant is in nonexclusive possession of (the premises upon) . . . which a controlled substance is found, it cannot be inferred that the defendant knowingly possessed the controlled substance unless there are other circumstances linking the defendant to the controlled substance. Factors you may consider in determining whether the defendant knowingly possessed the controlled substance include:

1. defendant's previous participation in the sale of a controlled substance;
2. defendant's use of controlled substances;
3. defendant's proximity to the area where the controlled substance was found;
4. the fact that the controlled substance was found in plain view;
5. incriminating statements of defendant;
6. suspicious behavior of defendant; and
7. proximity of defendant's possession(s) to the controlled substance."

The problem with this argument is that PIK Crim. 3d 67.13-D is designed to address nonexclusive possession of a controlled substance, not drug paraphernalia. We conclude that a similar instruction might have been fashioned to address nonexclusive possession of drug paraphernalia, but the failure of the defense to offer or request such a custom instruction precludes any conclusion that there was clear error.

*Did the District Court Err in Denying DuMars' Motion for New Trial Based on the State's Belated Disclosure of the Officer's Field Notes?*

DuMars next argues the district court erroneously denied her motion for a new trial on the basis that the State's failure to disclose an investigating officer's field notes until the officer was testifying from them was misconduct necessitating a new trial on the manufacturing-related counts. The State argues it was not required to disclose the field notes until the officer testified.

Whether to grant or deny a motion for a new trial is a matter which lies within the sound discretion of the trial court, and an appellate court reviews that decision under an abuse of discretion standard. *State v. Flynn,* 274 Kan. 473, 513, 55 P.3d 324 (2002).

K.S.A. 2004 Supp. 22-3212(b) authorizes discovery of "books, papers, documents, tangible objects, buildings or places, or copies, or portions thereof, which are or have been within the possession, custody or control of the prosecution, and which are material to the case and will not place an unreasonable burden upon the prosecution." It goes on to provide:

"Except as provided in subsections (a)(2) [authorizing results or reports of physical or mental exams and of scientific tests and experiments] and (a)(4) [authorizing discovery of memoranda of and list of witnesses to oral confessions made by the defendant], [22-3212(b)] does not authorize the discovery or inspection of reports, memoranda or other internal government documents made by officers in connection with the investigation or prosecution of the case, or of statements made by state witnesses or prospective state witnesses, other than the defendant, except as may be provided by law."

K.S.A. 22-3213(1) provides:

"In any criminal prosecution brought by the state of Kansas, no statement or report in the possession of the prosecution which was made by a state witness or prospective state witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination at the preliminary hearing or in the trial of the case."

See also *State v. Nuessen,* 23 Kan. App. 2d 456, 461, 933 P.2d·155 (1997) (holding police officer's report not discoverable until officer testifies at preliminary hearing or trial).

DuMars concedes that "[d]ocuments used in rebuttal need not be produced pursuant to the discovery procedure unless they are otherwise within the scope of K.S.A. 22-3212 and K.S.A. 22-3213." *State v. Trotter,* 245 Kan. 657, 660, 783 P.2d 1271 (1989). Nonetheless, she argues the State's previous disclosure of the officer's formal, typed report "gave defense counsel a false impression that discovery was complete, and the state's failure to disclose the conflicting field notes was a discovery violation necessitating a new trial."

DuMars relies on *State v. Evans*, 770 So. 2d 1174, 1181 (Fla. 2000), which held that "once discovery has been made to a defendant . . . the state has a continuing duty under [Florida Rules of Criminal Procedure] Rule 3.220[j] to notify the defendant of a substantial material change in report or . . . in a witness statement containing an important factual scenario." Although Kansas has a similar rule (K.S.A. 2004 Supp. 22-3212[g]), it has no application under these circumstances.

An officer's field notes are "reports, memoranda or other internal government documents made by officers in connection with the investigation or prosecution of the case" and are not discoverable under K.S.A. 2004 Supp. 22-3212(b). See, *e.g.*, *State v. Johnson & Taylor*, 223 Kan. 119, 124, 573 P.2d 976 (1977); *State v. Stafford*, 213 Kan. 152, 515 P.2d 769 (1973), *modified on other grounds* 213 Kan. 585, 518 P.2d 136 (1974); *State v. Mans*, 213 Kan. 36, 40, 515 P.2d 810 (1973). Because K.S.A. 2004 Supp. 22-3212(b) does not authorize discovery of an officer's field notes, K.S.A. 2004 Supp. 22-3212(g) did not apply and the State committed no error in failing to disclose the officer's field notes earlier. The court did not abuse its discretion by denying DuMars' motion for a new trial on these grounds.

## Did Cumulative Error Deny DuMars a Fair Trial?

DuMars contends the many errors of this case merit reversal under the cumulative error rule. The State replies that because DuMars' claims of error are nothing more than "smoke and mirrors," the cumulative effect of such errors is not great enough to be substantial prejudice.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' [Citation omitted.]" *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001).

To the extent that we have identified prosecutorial misconduct, we must first determine whether there was any ill will by the prosecutor. As our Supreme Court has recently acknowledged, deter-

mining whether there was ill will in the prosecutor's actions is a difficult task. *State v. Elnicki*, 279 Kan. 47, 66, 105 P.3d 1222 (2005). Examining the Supreme Court's analysis in both *Tosh* and *Elnicki*, where the misconduct is clearly deliberate and repeated, it is difficult to conclude that it was done in good faith. Here, the multiple instances of such misconduct, including at least two occasions of deliberate elicitation of inadmissible testimony from witnesses, the clear *Doyle* violation, the undermining of the unanimity instruction, and the misstatements during closing argument, are troublesome to this court and preclude any conclusion of good faith by the prosecutor.

As a necessary part of our determination of whether cumulative error merits a new trial, we must determine whether the identified errors, when considered together, were harmless. Moreover, before we can override the other factors incident to our analysis of prosecutorial misconduct, we must be able to say that both the K.S.A. 60-261 and the *Chapman v. California*, 386 U.S. 18, 22, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967), harmlessness tests have been met. See *Tosh*, 278 Kan. at 97. The statutory test is whether refusal to reverse would be inconsistent with substantial justice. The *Chapman* test requires us to determine that an error was harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial. See 386 U.S. at 22.

Here, we cannot be confident that the cumulative effect of the trial errors would have had little weight with the jury. Although there may have been sufficient circumstantial evidence to support the manufacturing-related convictions, it is also possible to conclude that the most substantial evidence of DuMars' involvement in manufacturing activities was the fruit of some of the errors identified above. Frankly, we share the sentiment of the State, expressed in oral argument, that upon first reading of the record of this trial the number of prejudicial errors is rather shocking. We disagree with the State, however, and with the dissent, respectfully, in their suggestions that when each error is viewed in isolation, they are "harmless" or "trivial." The purpose of the cumulative error rule is to empower an appellate court to grant relief when the quantity of errors or the totality of the circumstances have

denied the defendant a fair trial. *Plaskett*, 271 Kan. at 1022. This is precisely the case here. We conclude that DuMars was denied a fair trial and her convictions being appealed must be reversed.

*Was the Evidence Sufficient to Support DuMars' Convictions?*

Finally, DuMars argues the evidence was insufficient to prove she attempted to manufacture methamphetamine, possessed drug paraphernalia with the intent to manufacture methamphetamine, and endangered Holly Metro's 1-year-old child, C.W.

"When a defendant challenges the sufficiency of evidence, [the] standard of review is whether, after review of all of the evidence, viewed in the light most favorable to the State, the appellate court is convinced that a rational jury could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]" *State v. Mays*, 277 Kan. 359, 377, 85 P.3d 1208 (2004).

## Manufacturing-Related Convictions

The State argues there was sufficient circumstantial evidence showing DuMars was more than an innocent occupant of the house but does not list any of this alleged evidence. Relying on the fact that "drugs, drug paraphernalia and manufacturing items were found, readily viewable, throughout the entire home," the State offers only the inference that DuMars must have been involved in the manufacturing of methamphetamine. While a jury is allowed to draw reasonable inferences from the evidence, guilt cannot be based on inferences alone, and presumptions may not rest on presumptions nor inferences on inferences. See *State v. Star*, 27 Kan. App. 2d 930, 935, 10 P.3d 37 (2000).

Although the State does not make the argument on appeal, DuMars was convicted on an aiding and abetting theory. See K.S.A. 21-3205. A review of the record reveals there was sufficient evidence to show DuMars knew of Sullivan's activities and either acquiesced or did nothing to stop him. For example, DuMars and Sullivan lived together, DuMars knew that Sullivan manufactured methamphetamine, Sullivan's manufacturing supplies were found in DuMars' home, and Sullivan supplied DuMars with methamphetamine. Based on our review of all of the evidence, viewed in the light most favorable to the State, a rational jury could have found her guilty of the manufacturing-related charges. Although

there may have been sufficient evidence to support the manufacturing-related convictions, we must reverse those convictions based upon the cumulative trial errors previously discussed.

## Child Endangerment of C.W.

"Endangering a child is intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health may be injured or endangered." K.S.A. 21-3608(a). K.S.A. 21-3201(b) provides that "[i]ntentional conduct is conduct that is purposeful and willful and not accidental. As used in this code, the terms 'knowing,' 'willful,' 'purposeful,' and 'on purpose' are included within the term 'intentional.' "

DuMars argues the State presented no evidence that she intentionally "caused or permitted" Holly Metro's child C.W. to be in the kitchen near a plate of methamphetamine. The State contends that DuMars intentionally endangered C.W., arguing that "[w]hile the Defendant may not have been specifically questioned about knowing whether C.W. was in the home, the same is not required. C.W. was in 'plain view' . . . ." We disagree.

Our Supreme Court has held that in order to be found guilty of child endangerment one must either (1) cause a child to be placed in a situation where the child's life, body, or health may be injured or endangered or (2) *have authority or control over either the child or the abuser* and permit the child to be placed in such a situation. *State v. Wilson*, 267 Kan. 550, 567-68, 987 P.2d 1060 (1999). We conclude that the evidence, when viewed in the light most favorable to the State, does not demonstrate that DuMars had authority or control over Holly Metro's 1-year-old child, C.W. This conviction must be reversed.

In summary, we reverse the conviction of endangering Holly Metro's 1-year-old child, C.W. We reverse and remand for a new trial the convictions of attempted manufacture of methamphetamine and of possession of drug paraphernalia for manufacturing purposes. Although Dumars appealed other convictions, they were not adequately briefed and the appeals are deemed abandoned. *State v. Hunt*, 275 Kan. 811, 821, 69 P.3d 571 (2003).

Reversed and remanded for new trial on the manufacturing-related offenses.

MALONE, J., concurring and dissenting: I concur with the majority's determination that Wendy DuMars' conviction of child endangerment involving C.W. was not supported by sufficient evidence. I respectfully dissent from the majority's conclusion that DuMars is entitled to a new trial on the drug manufacturing-related charges based upon cumulative error. I take no exception to the analysis concerning the uneven application of the hearsay rule. However, the violation in this case was not nearly as glaring as the violation in *State v. Brickhouse*, 20 Kan. App. 2d 495, 500-03, 890 P.2d 353, *rev. denied* 257 Kan. 1093 (1995). This error alone would not be sufficient to grant DuMars a new trial. The majority's finding of cumulative error is based primarily upon the alleged instances of prosecutorial misconduct.

I disagree with the findings of prosecutorial misconduct in this case, except for the prosecutor's awkward comment in closing argument undermining the unanimity instruction which was harmless. I take special exception to the majority's conclusion that "[t]he State's conduct in eliciting hearsay in [this case] undoubtedly constitutes gross and flagrant misconduct." This finding is based upon two instances when the prosecutor elicited hearsay evidence during the course of a 3-day trial. In one of these instances, inculpatory instance No. 5, the prosecutor's question did not directly elicit inadmissible hearsay because the declarant was Heather Metro who had previously testified at the hearing and was available for cross-examination. The response to the question was only objectionable because it contained hearsay within hearsay. In any event, I do not find either hearsay violation to be particularly egregious, and I am unable to discern any ill will by the prosecutor in presenting this evidence.

I further disagree that the isolated *Doyle* violation, see *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), based upon a witness' nonresponsive answer to the prosecutor's question, can somehow be labeled as misconduct by the prosecutor. Finally, the alleged misstatements about whether the drug ev-

idence was in open view at the residence were trivial. Much of the evidence at DuMars' residence was out in the open, and DuMars only complains because the prosecutor stated that "all" the evidence was in the open. In any event, the jury was allowed to see a videotape of the entire search and could make this determination itself.

An appellate court should be wary of finding prosecutorial misconduct based upon the elicitation of inadmissible testimony, especially when the testimony is admitted at trial without objection. This is a far too convenient method of circumventing the contemporaneous objection rule which normally governs appellate review of evidentiary issues. There may be instances where a prosecutor commits misconduct by deliberately attempting to introduce inadmissible evidence at trial in direct violation of a court's ruling. However, I do not see evidence of such misconduct in this record.