IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,949

STATE OF KANSAS,
*Appellee*,

v.

SHELBERT SMITH,
*Appellant*.

SYLLABUS BY THE COURT

1.

Although generally untimely appeals are not permitted, an untimely appeal may be allowed when: (1) the defendant was not informed of his or her right to appeal; (2) the defendant was not furnished an attorney to pursue the appeal; or (3) the defendant was furnished an attorney who failed to perfect the appeal.

2.

The mandate rule does not constitute an inflexible jurisdictional barrier to a party's ability to raise a new issue following a remand.

3.

In general, the mandate rule applies to prevent district court action on remand only when an issue has already been finally settled by earlier proceedings in a case, including issuance of the appellate mandate. However, when a remand order is stated in specific terms following deliberate litigation choices by the parties, the parties are not to raise new issues for the district court's consideration unless those issues arise from late-

1

breaking facts. Nor are the parties generally free to resurrect issues tangentially mentioned before the district court previously, yet left untouched by the parties' own litigation strategy.

4.

On the facts of the case, the two previous appellate mandates specifically limited the district court to consider only the credibility of the defendant in the context of the third *Ortiz* exception.

5.

A district court's credibility determination in an *Ortiz* hearing is reviewed for substantial competent evidence. When a district court makes an adverse credibility determination, that finding will be upheld unless the party challenging it can demonstrate that the district court arbitrarily disregarded undisputed evidence, or can demonstrate some extrinsic consideration such as bias, passion, or prejudice.

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Opinion filed March 12, 2021. Affirmed.

*Richard Ney,* of Ney, Adams & Miller, of Wichita, argued the cause, and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek Schmidt,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

2

WILSON, J.: For the third time, Shelbert L. Smith appeals the decision of the district court denying his motion for leave to appeal out of time. Smith raises multiple issues for our consideration. Twice before, this court has considered Smith's case; twice before, it has reversed the decision of the district court and remanded the matter. See *State v. Smith*, 308 Kan. 778, 423 P.3d 530 (2018) (*Smith II*); *State v. Smith*, 304 Kan. 916, 377 P.3d 414 (2016) (*Smith I*). This time, we affirm the district court's ruling.

Smith's argument requires us to consider the exceptions to the general rule prohibiting untimely appeals, as set forth in *State v. Ortiz¸* 230 Kan. 733, 640 P.2d 1255 (1982). "Under those exceptions, an untimely appeal may be allowed when: (1) the defendant was not informed of his or her right to appeal; (2) the defendant was not furnished an attorney to pursue the appeal; or (3) the defendant was furnished an attorney who failed to perfect the appeal." *Smith I*, 304 Kan. at 919. Smith's arguments invoke the first and third *Ortiz* exceptions. Issues concerning the scope of previous mandates and the finality of a journal entry are also raised.

FACTS

Although the *Smith I* and *Smith II* opinions have already set forth the factual and procedural history of the case, we will briefly summarize the pertinent facts once more. In 1993, Smith pled no contest to first-degree felony murder, aggravated kidnapping, aggravated robbery, and possession of a firearm by a minor, all arising out of the killing of Cleo Bell. At sentencing, the district court rejected the arguments of Smith's attorney, Max Opperman, and imposed a life sentence each for murder and aggravated kidnapping, a sentence of 10 years to life for aggravated robbery, and a sentence of 30 days in jail for the firearm convictions—all consecutive. The district court also told Smith that it could modify the sentence imposed through a procedure then known as a 120-day callback—a

3

statutory mechanism eliminated with the passing of the Kansas Sentencing Guidelines Act, K.S.A. 1993 Supp. 21-4701 et seq.

Although Opperman filed a timely motion for probation or modification of sentence, the district court denied it in a "motion minutes sheet" dated March 2, 1994. In the motion minutes sheet, the district court directed the State to prepare an appropriate journal entry. Additionally, the district court did not check the box on the motion minutes sheet signifying "[t]hat this document shall serve as the court's order without further journal entry/order." None of the parties or their representatives were present at the time the district court denied the motion for modification, and the then-prosecutor has since represented that he was unaware of the district court's ruling or its order directing the State to prepare a journal entry.

Nearly 20 years later, Smith filed a pro se motion for leave to appeal out of time. Among other things, this motion alleged that Opperman was ineffective because he "failed to inform the defendant upon his options to appeal" and "failed to perfect and complete an Appeal when the defendant specified that he wasn't happy with the decision and told his attorney he wanted to appeal the judgment made." This court remanded the matter in order for the district court to conduct a hearing to evaluate Smith's eligibility to appeal out of time under the exceptions enumerated *Ortiz*, 230 Kan. 733.

At the first *Ortiz* hearing, Smith testified that he had pled no contest because Opperman—who had died in 2009—had represented that the judge would show leniency and consider his age at sentencing. Additionally:

> "Smith further testified that immediately after his sentencing hearing, he told Opperman
> he wanted to appeal but Opperman said to wait until after the 120-day callback. After the

4

120-day period had passed with no further word from Opperman, Smith began trying to contact Opperman by phone—sometimes two or three times a day for all of 1994. When these efforts proved futile, Smith gave up out of frustration." *Smith II*, 308 Kan. at 780.

No evidence was presented on the adequacy of information provided to Smith concerning his appellate rights (hereinafter, "first *Ortiz* exception claim"). *Smith I*, 304 Kan. at 918. Without making findings of fact, the district court denied Smith's motion, apparently solely because Smith had waited too long to attempt an appeal. Smith appealed, arguing "that he should be allowed an untimely appeal because his appointed trial counsel failed to file the appeal that [he] requested." *Smith I*, 304 Kan. at 916-17. In other words, Smith did not present his first *Ortiz* exception claim in this appeal, but instead limited his arguments to the third *Ortiz* exception. *Smith I*, 304 Kan. at 920.

The *Smith I* court reversed, taking issue with the district court's failure to make findings of fact in order to evaluate Smith's credibility and, thus, his attempt to show entitlement under the third *Ortiz* exception. *Smith I*, 304 Kan. at 922. The court then remanded the matter "once again for the express purpose of determining whether Smith's testimony is credible, i.e., whether he told his attorney to appeal, whether the attorney did not file an appeal, and whether Smith would have appealed if his attorney had not failed to perform." *Smith I*, 304 Kan. at 922.

A different district court judge held a second *Ortiz* hearing on December 9, 2016. *Smith II*, 308 Kan. at 780. Again, the evidence presented at this hearing focused entirely on Smith's third *Ortiz* exception argument, in accordance with the *Smith I* mandate. *Smith II*, 308 Kan. at 780-81. Following the second *Ortiz* hearing, the district court concluded that Smith's testimony was not credible, offering 13 observations to support this finding. *Smith II*, 308 Kan. at 782-83.

Smith again appealed, and the Kansas Supreme Court again reversed the district court's decision. This time, the court focused on the district court's improper consideration of Smith's hypothetical musical choices (which had never been discussed before the court) and the district court's sua sponte order to the Kansas Department of Corrections ("KDOC") "to produce records of Smith's 'tattoos and brands.'" *Smith II*, 308 Kan. at 784-88. The court concluded that both actions created the appearance of bias or prejudice and thus warranted reversal. *Smith II*, 308 Kan. at 788-89. Ultimately, the court—referencing the mandate of *Smith I*—reversed the district court's decision and remanded the matter to a different judge, whom it cautioned "to consider only evidence in the record that is relevant to Smith's credibility." *Smith II*, 308 Kan. at 789.

Following the *Smith II* remand, a third *Ortiz* hearing was held before yet another district court judge. At this hearing, Smith's counsel raised two new arguments not previously addressed by either prior district court decision or by the *Smith I* and *Smith II* courts. Specifically, Smith's counsel argued that, because the district court filed no journal entry memorializing its decision with respect to Smith's motion for sentence modification, the time to file an appeal never began to run. Smith's counsel also argued that Smith's circumstances satisfied the first *Ortiz* exception, i.e., that he was not adequately informed of his appellate rights.

Smith presented testimony from licensed psychologist Dr. Brian Stone. Prior to the hearing, Dr. Stone tested Smith in order to assess his faculty for "problem solving, reasoning," "automatic processing of language or how much auditory memory you can hold," and "different aspects of reading, writing, and math." Based on these tests, Dr. Stone testified that Smith's overall IQ score was 95, or in the 36th percentile, but that his score was significantly lower—88, the 21st percentile—in verbal IQ. Dr. Stone diagnosed Smith with dyslexia and dysgraphia and further testified that, when he entered a plea as a

6

16-year-old, Smith would have had the auditory memory of an average six-year-old child, which would have made it "difficult" to remember and absorb information in a setting like a courtroom or a school. However, Dr. Stone elaborated that Smith "had better attention than I did"—he just had difficulty absorbing large amounts of auditory information at once. As Dr. Stone put it, "Give it to him just enough at once, he's fine. The minute he gets bombarded with blah, blah, blah, that's hard for him to internalize it." According to Dr. Stone, "One-on-one in a small room without additional noise or filling up his auditory memory," Smith could comprehend information "as long as you're not moving too fast." He opined that courtroom proceedings would generally pass too quickly for Smith to fully understand, although "if he could pause you all or rewind, he could eventually get it."

Dr. Stone also opined that Smith could not have read his plea agreement form at the time he signed it, based on his "fourth and fifth grade reading level": "I would only hope they read it to him slowly."

Smith also testified. According to Smith, Opperman only met him once in jail, after the plea but before sentencing; otherwise, he only saw Opperman on court dates. He also testified that Opperman gave him the plea form while he was in court, on the same day he entered his plea. Smith testified that he did not know about his right to appeal from his plea form, and he denied that Opperman ever went over the document with him. Smith admitted that he did not ask questions when he did not understand something, however, because, "I felt like my lawyer knew what he was doing. I didn't feel like I needed to ask any questions."

According to Smith, he told Opperman that he wanted to appeal shortly after sentencing; Opperman responded by stating that he would appeal after the 120-day call-

7

back. However, Smith never heard any further followup from Opperman and was unable to contact Opperman despite repeated attempts by himself, his mother, and his grandmother to call Opperman throughout 1994. Smith testified that he was trying to contact Opperman because "I wanted to do an appeal," although he claimed that he did not understand what an "appeal" meant. He further clarified that he "had an idea what it meant" and that he "didn't want to spend the rest of my life in prison, so I asked him for an appeal." Smith testified that he did not know his appellate rights and did not know how to appeal, as neither Opperman nor the judge ever told him about his right to appeal. Even at the third *Ortiz* hearing, Smith claimed that he understood "[n]othing really" about his right to appeal. When asked how he knew to ask for an appeal, if no one had ever explained his rights, Smith was equivocal:  "Well, after I got three life sentences, that was my only question that I wanted to do is ask for an appeal." Smith explained his nearly two-decade delay in filing any attempt to appeal by claiming that he "was accumulating stuff dealing with appeals so maybe I could find somebody to help me file an appeal." Smith did not write his 2013 motion to appeal out of time; another inmate assisted him.

In an Order Regarding Mandate filed September 23, 2019, the district court found Smith's testimony not to be credible. The district court concluded that the newly raised issues concerning the first *Ortiz* exception and the journal entry exceeded the "very specific scope of the remand." However, the district court commented in a footnote that, if it was incorrect about this conclusion, then the facts relevant to the journal entry issue were not in dispute, and it attempted to make findings of fact relevant to the first *Ortiz* issue. As to Smith's credibility regarding the third *Ortiz* exception, the district court highlighted the following facts:

• Smith had "waited nearly 20 years after sentencing to file an appeal," a lengthy delay which the district court viewed as "inconsistent with Mr. Smith's testimony that he desired an appeal."

• Smith's learning disabilities did not prevent him from writing the sentence "I want to appeal," and although he did not know the meaning of the word "'appeal' . . . he fully understood it was the appropriate legal response when someone gets sentenced to multiple life sentences and doesn't want to spend the rest of his life in prison."

• Although Smith obtained his GED in 1998 or 1999, "he made no attempt, in writing or otherwise, to contact his lawyer, contact another attorney, contact his mother or grandmother, contact a friend or anyone on the outside, contact the district court, or secure the help of a fellow inmate" for another 15 years.

• The *Smith I* court's finding that Smith "'said he eventually gave up because he "was in limbo" and did not know what to do, until 19 years later'" contradicted his assertion that he spent the 19-year interim between his conviction and his appeal "'accumulating stuff dealing with appeals.'"

• "[U]ndisputed evidence concerning Mr. Smith's grandmother" somewhat corroborated Smith's testimony that he told Opperman to appeal. But this evidence was "not definitive" because "the actual message Mr. Smith asked his grandmother to give Mr. Opperman was not that he wanted to appeal, but only that 'he needed to talk to his lawyer.'"

• Smith's lengthy delay and Opperman's death removed "the only other witness to Mr. Smith's alleged statement he wanted to appeal."

9

• The district court found "doubtful" Smith's testimony that "Opperman never went over the plea document with him before the plea hearing," which contradicted what Smith told the district court at the plea hearing itself. Nor did the district court believe either that Opperman speculated that he "did not see Mr. Smith going to prison" or that it took Smith nearly 20 years to find an individual in prison to draft his motion to appeal his sentence out of time.

The above facts, combined with the district court's observations of Smith's testimony in person, led the district court to find Smith's testimony "not credible." The district court thus denied Smith's motion, and Smith subsequently appealed.

ANALYSIS

Smith raises the following issues for our consideration: whether the district court erred in concluding that his newly raised claims were outside the scope of the *Smith II* mandate, whether he was entitled to relief under the first and third *Ortiz* exceptions, and whether the district court's failure to file a journal entry concerning its decision on his initial motion for sentence modification means that his time to appeal *still* has not elapsed. Because we agree with the district court that the *Smith II* mandate was too narrow to permit consideration of Smith's new arguments, we decline to address those issues. Further, we affirm the district court's denial of Smith's motion on the basis of the third *Ortiz* exception, as discussed below.

*The* Smith II *mandate did not permit Smith to raise new issues or to resurrect an argument alluded to in the initial motion but ignored by Smith until now.*

We first assess whether the district court correctly concluded that the *Smith II* mandate was too narrow to permit consideration of Smith's first *Ortiz* exception claim or his claim concerning the district court's missing journal entry. A district court's compliance with an appellate court mandate presents a question of law, which we review de novo. *State v. Soto*, 310 Kan. 242, 256, 445 P.3d 1161 (2019).

Initially, we note that Smith has taken somewhat inconsistent positions regarding whether his first *Ortiz* exception claim was "newly" raised. In his brief, Smith argued that he alluded to this issue in the pro se motion authored by another inmate, rather than by Smith, but—until the third *Ortiz* hearing—it had never actually been litigated. On the other hand, in his reply brief, Smith has argued that both the first *Ortiz* exception claim and the missing journal entry claim "were not 'old' issues" but were, instead, "issues that had never been raised before and could be properly raised at the remand hearing." However, under the current factual and procedural posture of the case, we find the distinction irrelevant.

Smith primarily relies on two cases to support his proposition that these issues were not beyond the scope of the *Smith II* mandate: *Soto*, 310 Kan. at 255-57, and *State v. DuMars*, 37 Kan. App. 2d 600, 603-04, 154 P.3d 1120 (2007). The *Soto* court examined "the existence and extent of any limits on the district court's subject matter jurisdiction after an appellate mandate issues." 310 Kan. at 250. Rejecting the State's theory that a mandate focused on a single issue—specifically, a resentencing following a vacated "hard 50" sentence—and therefore deprived the district court of jurisdiction "to do anything else after remand, period," the *Soto* court reasoned that the limitations encompassed by the mandate rule reflected "the hierarchy of Kansas courts" rather than "broad limits on subject matter jurisdiction once a case was remanded." 310 Kan. at 250-52. As the court summarized:

"The [mandate] rule applies to prevent district court action on remand only when an issue has already been finally settled by earlier proceedings in a case, including issuance of the appellate mandate. If a final settlement of an issue has occurred, the district judge is not free to expand upon or revise that history. The mandate rule does not, however, prevent a district judge from doing whatever else is necessary to dispose of a case. This means the district judge must not only do as the mandate directs; he or she must also do what is needed to settle other outstanding issues that must be decided to complete district court work on the case. Such issues may have been allocated for decision in the district court in the first place and then untouched by appellate proceedings. They may include issues arising from late-breaking facts. [Citations omitted.]" 310 Kan. at 256.

The court went on to reason that Soto's newly raised post-mandate issue involved "late-breaking facts" that were "unknown to him until the morning his resentencing trial was set to begin." 310 Kan. at 256. This matter, thus, was not proscribed by the mandate rule. 310 Kan. at 257.

In *DuMars*, an earlier panel of the Kansas Court of Appeals had reversed the defendant's convictions and remanded the case for a new trial. 37 Kan. App. 2d at 601 (citing *State v. DuMars*, 33 Kan. App. 2d 735, 108 P.3d 448 [2005]). Following remand, the district court dismissed the defendant's "drug-related" charges based on double jeopardy concerns—an issue that had not been raised or litigated during the first appeal. On appeal the second time, the State argued that the district court had exceeded the scope of the appellate mandate in ruling on the defendant's double jeopardy claim, rather than proceeding on immediately to retrial. Reasoning that the previous appellate mandate ordering a new trial on the defendant's drug convictions "did not specifically address the defendant's double jeopardy claim, and the claim is not inconsistent with this court's ruling," the court concluded that the district court did not exceed the mandate in dismissing the charges. 37 Kan. App. 2d at 604.

12

The *DuMars* panel also relied on the following passage for support:

"'Where the mandate of an appellate court merely reverses a ruling of the district court and remands the case for further proceedings but does not direct the judgment of the district court, the district court has discretion to preside over the remaining trial proceedings, as if the district court had originally made the ruling mandated by the appellate court. [Citation omitted.] In other words, a district court may address those issues necessary to the resolution of the case that were left open by the appellate court's mandate. [Citations omitted.]'" 37 Kan. App. 2d at 604 (quoting *Edwards v. State*, 31 Kan. App. 2d 778, 781, 73 P.3d 772 [2003]).

Extrapolating from this language, Smith argues that the district court's "'work' . . . was to decide whether the Defendant could file a notice of appeal." And in the context of a more general remand, he would be correct. See, e.g., *State v. Morton*, 283 Kan. 464, 471-73, 153 P.3d 532 (2007). But the *Smith II* remand order was not a general, open-ended mandate; instead, it contained specific orders that were too narrow to grant Smith his desired carte blanche to open and explore new issues. Unlike *DuMars* or *Morton,* the district court here was not commanded to afford Smith a new trial. Instead, both the *Smith I* and *Smith II* opinions remanded the matter to the district court on a narrow basis:

"The last time Smith was before this court, we established that if his testimony was credible, then he has fulfilled the requirements for the third Ortiz exception and can appeal out of time. Our remand instructions were clear. Indeed, the district court set them out verbatim at the beginning of its December 15, 2016, journal entry denying Smith's motion to file a late appeal:

'This case was remanded "for the express purpose of determining whether Smith's testimony is credible, i.e., whether he told his attorney to appeal,

whether the attorney did not file an appeal, and whether Smith would have appealed if his attorney had not failed to perform.'

"As a result, the sole issue before us is whether the district court was successful in that effort. [Citations omitted.]" *Smith II*, 308 Kan. at 783 (quoting *Smith I*, 304 Kan. at 922).

The *Smith II* court went on to reverse and remand the matter "with directions" yet again in order for a new district court judge to make the necessary credibility determinations, but this time cautioning the district court "to consider only evidence in the record that is relevant to Smith's credibility." *Smith II*, 308 Kan. at 789.

Nor are either of Smith's new issues based on newly discovered or "late-breaking" facts, as was the case in *Soto*. 310 Kan. at 256. If, as Smith now claims, Opperman truly never explained his appellate rights to him, and he was unable to comprehend the plea form—which explicitly described the rights that would be pertinent to the first *Ortiz* exception—such deficiencies arose long before Smith filed his initial pro se motion. The same is true of the district court's missing journal entry, as nothing in the record indicates the district court file was not available to Smith or his counsel prior to the third *Ortiz* hearing.

The mandate rule does not constitute an inflexible jurisdictional barrier to a party's ability to raise a new issue following a remand, but where a remand order is stated in specific terms following deliberate litigation choices by the parties—choices reinforced, in the present case, over two prior *Ortiz* hearings and two prior appeals—the parties are not free to endlessly expand on the issues the district court may consider in the absence of new (or newly discovered) facts. Here, Smith had two previous *Ortiz* hearings and two previous appeals in which to present these issues; his failure to do so led the *Smith I* and

14

*Smith II* courts to winnow the pertinent issues for the district court's consideration down to the singular issue of Smith's credibility vis-à-vis the third *Ortiz* exception. Under these facts, we believe the district court correctly refused to consider Smith's first *Ortiz* exception and missing journal entry claims.

*In light of the district court's credibility finding with respect to Smith's third* Ortiz *exception claim, we affirm the denial of Smith's motion to appeal out of time.*

Turning to Smith's remaining issue—and the sole matter for which the *Smith I* and *Smith II* courts remanded the case—we must consider whether the district court erred in concluding that Smith was not entitled to appeal out of time under the third *Ortiz* exception. At its core, Smith's claim asserts that the district court's adverse credibility determination was not supported by substantial competent evidence. In particular, Smith's arguments claim that the district court's decision was "hyper-technical and constituted an arbitrary disregard of undisputed evidence from the Defendant, his grandmother, and from Dr. Stone."

An appellate court applies a bifurcated standard when reviewing a district court's ruling on an *Ortiz* exception:

> "The facts underlying an *Ortiz* exception ruling should be examined on appeal under a substantial competent evidence standard of review. The ultimate legal determination of whether those facts fit the exception should be reviewed under a de novo standard." *State v. Phinney*, 280 Kan. 394, 404, 122 P.3d 356 (2005).

"Substantial competent evidence is 'such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion.'" *State v.*

15

*Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019) (quoting *Smith v. Kansas Dept. of Revenue*, 291 Kan. 510, 514, 242 P.3d 1179 [2010]). In evaluating the sufficiency of the evidence, an appellate court does not weigh witness credibility. *Smith I*, 304 Kan. at 922. As in *Smith II*, we are again principally asked to review a district court's credibility determination. "We will not reject such a negative finding on appeal unless the party challenging it 'proves arbitrary disregard of undisputed evidence, or some extrinsic consideration such as bias, passion, or prejudice.'" *Smith II*, 308 Kan. at 783 (quoting *State v. Zachary Smith*, 303 Kan. 673, 679, 366 P.3d 226 [2016]).

Unlike the situation before us in *Smith II*, however, the district court did not consider materials outside of the record or make inappropriate conclusions in making its credibility finding, which was the express purpose of its mandate. While the district court noted that Smith's nearly 20-year delay in attempting to appeal was not an absolute bar, it did rely on the *Smith I* court's observation that this delay might be relevant to an assessment of Smith's credibility. We cannot disagree with this proposition. And contrary to Smith's arguments, we do not believe the district court gave mere "lip service" to Dr. Stone's testimony with respect to his academic limitations. Instead, the district court's decision took those limitations into account, as well as the evidence that Smith could write the sentence "'I want to appeal'" and that he knew that an "appeal" "was the appropriate legal response when someone gets sentenced to multiple life sentences and doesn't want to spend the rest of his life in prison."

The district court also considered Smith's grandmother's testimony, emphasizing that the "actual message Mr. Smith asked his grandmother to give Mr. Opperman was not that he wanted to appeal, but only that 'he needed to talk to his lawyer.'" While others may have reached a different inference, we are not convinced that the district court's conclusion was unreasonable in this regard.

16

Smith also highlights an ostensible instance of Opperman's inaction as evidence that Opperman was unresponsive with respect to this case. Specifically, Smith points to a proposed restitution order for $5,254 sent to Opperman on two occasions in 1994, to which Opperman apparently did not respond or object. Opperman's failure to respond, however, does not necessarily provide the kind of evidence of his alleged "indolence" that Smith now asserts. At the sentencing hearing, the State suggested that the total amount of restitution could have exceeded $200,000, but that more information would be required. While $5,254 is certainly a substantial amount of restitution, it is, compared with the State's initial suggestion, a pittance. Consequently, if Opperman had no reason to object, it does not necessarily follow that he was unresponsive in other areas of the case, as Smith asks the court to infer. Again, while the district court could have drawn the inference Smith seeks, we do not believe the district court acted unreasonably in refusing to do so.

Smith also attacks the district court's criticism of Smith's apparently inconsistent testimony with respect to his efforts to pursue an appeal. Smith had previously testified that, after attempting to contact Opperman multiple times a day for nearly all of 1994, "I didn't know what to do. I was frustrated, so I finally gave up"—until "recently," when "I found somebody at the Hutchinson Correctional Facility that would help assist me in doing this appeal." At the current hearing, as the district court noted, Smith testified that he never gave up on his appeal and that he spent the intervening 19 years "accumulating stuff dealing with appeals." Smith suggests that, contrary to the district court's focus on this apparent inconsistency, "[a] fair reading" of the apparent incongruity is that Smith was merely expressing frustration with his continued inability to contact Opperman, not abandoning his appellate rights. But again, that is only *one* "fair reading" of the facts. While another judge might have agreed with this "fair reading" in the district court's position, we do not believe the district court's conclusion to the contrary to be

unreasonable. The same is true of Smith's argument that the district court—in highlighting the incongruity between Smith's most recent testimony that Opperman never went over the plea with him and his original representation to the contrary at the plea hearing—simply ignored "the very real possibility . . . that the Defendant did not remember going over the form with Opperman because of his significant learning disabilities."

While not all jurists may have reached the same conclusion, we do not believe the district court's adverse credibility determination lacked the support of substantial competent evidence, disregarded undisputed evidence, relied on unreasonable inferences, or otherwise evinced bias, passion, or prejudice. As that credibility determination forms the core of the evidentiary support for the district court's denial of Smith's claim under the third *Ortiz* exception, we affirm that ruling.

CONCLUSION

We affirm the district court's decision denying Smith's motion for leave to appeal out of time under the third *Ortiz* exception. We further affirm the district court's conclusion that Smith's other issues exceed the scope of the *Smith II* mandate.